**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| | : | |
| In re: | : | Chapter 7 |
| | : | |
| JAMES FITZGERALD BOWYER, | : | Case No. 19-13113(MDC) |
| | : | |
| Debtor. | : | |
| | : | |
| | : | |
| THE KIM LAW FIRM LLC and | : | |
| RICHARD KIM, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Adv. No. 19-00200(MDC) |
| | : | |
| JAMES FITZGERALD BOWYER, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**SUPPLEMENTAL BRIEF TO THE MOTION OF DEFENDANT
JAMES FITZGERALD BOWYER TO DISMISS PLAINTIFFS' COMPLAINT**

This Honorable Court requested additional briefing regarding the requirement to plead physical injury supported by competent medical evidence in order to adequately plead a cause of action for Intentional Infliction of Emotional Distress ("IIED") under Pennsylvania law as interpreted by Federal Courts of the Third Circuit.

Both Pennsylvania courts and courts in this Circuit require a plaintiff to allege some type of physical injury or harm in order to adequately plead a claim for IIED. *See Kazatsky v. King David Memorial Park*, 515 Pa. 183, 527 A.2d 988, 995 (Pa.1987)); *Hart v. O'Malley*, 436 Pa. Super. 151 175, 647 A.2d 542 (Pa. Super. 1994) ("it is clear that in Pennsylvania, in order to state a claim under which relief can be granted for the tort of IIED, the plaintiff must allege a physical injury"); *Rudas v. Nationwide Mut. Ins. Co.*, 1997 U.S. Dist. LEXIS 169, 1997 WL 11302, at *17

(E.D. Pa. Jan. 10, 1997)  (dismissing claim for IIED where the plaintiff had not alleged physical injury). It is not enough to merely allege severe distress. *Fewell v. Besner*, 444 Pa. Super. 559, 664 A.2d 577 (Pa. Super. 1995) (affirming the grant of preliminary objections as to plaintiff's claim of IIED where plaintiff alleged she "suffered severe emotional distress" because the Complaint failed to allege physical injury).

A plaintiff must allege that he or she "suffer[ed] some type of resulting physical harm due to the defendant's outrageous conduct," which must be supported by competent medical evidence. *Dennis v. DeJong*, 867 F. Supp. 2d 588, 660 (E.D. Pa. 2011) (dismissing IIED claim "because plaintiffs have not alleged facts regarding "expert medical confirmation that [plaintiffs] actually suffered the claimed distress." Plaintiffs merely contend that they suffered depression and anxiety, without alleging expert medical confirmation for these facts.") (citations omitted); J*ames v. City of Wilkes-Barre*, No. 3:10-CV-1534, 2011 U.S. Dist. LEXIS 90626, at *22-24 (M.D. Pa. June 17, 2011) (dismissing Plaintiff's IIED claim because Plaintiff filed to allege competent medical evidence); *see also Maldonado v. City of Philadelphia*, Civ. No. 18-1492, (E.D. Pa. Jan. 18, 2019)(Sánchez, J.) (dismissing an IIED claim for the failure to plead competent medical evidence substantiating the claim) (attached as Exhibit A).

Plaintiff has not alleged a physical injury or harm as well as competent medical evidence to support his IIED claim.  Accordingly, it should be dismissed.   *Ghrist v. CBS Broad., Inc*., 40 F. Supp. 3d 623, 630-31 (W.D. Pa. 2014) (dismissing Plaintiff's claim for IIED wherein the Plaintiff failed to allege the necessary physical harm, coupled with averments of competent medical evidence of such harm, to support such a claim).

Respectfully submitted,

**KENNY, BURNS & MCGILL**

/s/Thomas D. Kenny_____
Thomas D. Kenny, Esquire
Identification No. 77611
Eileen T. Burns, Esquire
Identification No. 80404
1500 John F. Kennedy Blvd.
Suite 520
Philadelphia, PA  19102
(215) 423-5500
filings@kennyburnsmcgill.com

Attorneys for James Fitzgerald Bowyer

Dated:  January 2, 2020

**CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of January 2020, I caused a true and correct copy of

the foregoing to be served upon all counsel via the court's electronic filing system.

/s/ Thomas D. Kenny
Thomas D. Kenny, Esquire

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KAREN MALDONADO, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | No. 18-1492 |
| | : | |
| CITY OF PHILADELPHIA | : | **FILED UNDER SEAL** |
| DEPARTMENT OF HUMAN | : | |
| SERVICES, et al. | : | |

### MEMORANDUM

**Juan R. Sánchez, C.J.**                                          **January 18, 2019**

Plaintiffs Karen and Anibal Maldonado, the mother and step-father of I.M., bring this action seeking damages for the harm they suffered as a result of an alleged conspiracy between the owners of a dance company with which I.M. was a part, members of the Philadelphia Department of Human Services, and I.M.'s maternal uncle to deprive Mrs. Maldonado of the custody rights over her daughter. The Maldonados bring their claims against the City of Philadelphia, the Philadelphia Department of Human Service's former Acting Commissioner Jessica Shapiro, Philadelphia Department of Human Service employees Javier Aguero and Roya Paller, dance company Motion N' Dance, Motion N' Dance owners Thomas Marcucci, Staciann Marcucci, and dance instructor Jessica Gibson, and I.M.'s uncle Christopher Hermann pursuant to 42 U.S.C. § 1983 and Pennsylvania state law. In response to the Maldonados' Amended Complaint, Defendants filed separate motions to dismiss, arguing all claims against them should be dismissed for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, Defendants' motions to dismiss will be granted in part and denied in part.

### FACTS

Plaintiffs Karen and Anibal Maldonado (Mrs. and Mr. Maldonado or collectively, the Maldonados) are the mother and step-father of I.M.—Mrs. Maldonado's daughter from a prior

relationship. *See* Am. Comp. ¶ 2.    During the relevant time period alleged in the Amended

Complaint, I.M. was a minor in the custody of Mrs. Maldonado. *See id.* At a young age, I.M.

became interested in dance. Around 2007, Mrs. Maldonado enrolled I.M. in dance classes held at

Motion N' Dance (Motion), a dance school located in Philadelphia, Pennsylvania and owned and

operated by Thomas and Staciann Marcucci (Mr. and Mrs. Marcucci). *See id.* ¶ 32-34. Jessica

Gibson—Mrs. Marcucci's mid-twenties daughter—works at Motion as a dance instructor. *See id.*

¶ 34. While enrolled at Motion, I.M. excelled in her dance classes and began representing Motion

in state and national dance competitions, which required I.M. to travel to competition locations

with the Marcuccis and Gibson. Through her involvement in these competitions and dance classes,

I.M. formed a very close relationship with the Marcuccis and Gibson, evidenced by the Marcuccis

and Gibson often exchanging text messages with I.M. and taking pictures with her, *see id.* ¶¶ 46-

50, in addition to purchasing expensive gifts for her, treating her to meals at fancy restaurants, and

taking her on trips. For example, the Marcuccis gifted I.M. cellphones and laptops, routinely

treated her to dinners at Ruth's Chris Steak House and Chima Steakhouse in Philadelphia, and

took her to Disney World for her 16th birthday. *See id.* ¶¶ 42-43.

Due to the time I.M. spent with the Marcuccis and Gibson and gifts she received, Mrs.

Maldonado became concerned about I.M.'s relationship with them. Around May 2013, on a

cellphone Gibson had purchased for I.M., Mrs. Maldonado found a photograph of Gibson and I.M.

laying together in bed, another photograph of the two embracing each other, and text messages

where Gibson stated she was crying while staring at I.M.'s toothbrush and disparaging the

Maldonados' parenting of I.M. and her home life. *See id.* Ex. A. After Mrs. Maldonado found these

photographs and text messages, Mrs. Maldonado alerted Mrs. Marcucci of her concerns about the

nature of I.M.'s relationship with Gibson. *See id.* ¶ 47. Subsequently, Mrs. Marcucci told Mrs.

Maldonado she had spoken to Gibson about her behavior and apologized for Gibson's actions. Despite her concerns, however, Mrs. Maldonado continued to allow I.M. to dance at Motion. *See id.* ¶ 52-53.

In early May 2016, Mrs. Maldonado's concerns about I.M.'s relationship with the Marcuccis and Gibson were renewed when she realized Gibson was still texting I.M, the Motion website was filled with pictures of I.M., and Mrs. Maldonado witnessed I.M. perform a sexy dance in front of Mr. Marcucci at a state competition. *See id.* ¶ 55-64. Mrs. Maldonado subsequently decided I.M. should not have any further contact with the Marcuccis and Gibson or attend Motion for dance lessons. Mrs. Maldonado's decision to prevent I.M. from continuing to have contact with the Marcuccis and Gibson and taking dance lessons at Motion was extremely upsetting to I.M. *See id.* ¶ 66.

Later that month, on May 19, 2016, I.M. informed her school officials she was being physically and psychologically abused at home. *Id.* ¶¶ 67-68. I.M.'s counselor—who I.M. saw at the recommendation of the Marcuccis—told school officials if I.M. returned home, she would be tortured and killed. *Id.* ¶ 69, 74, 76. That same day, Mrs. Marcucci drove I.M. to the Philadelphia Police Department, where I.M. filed a report of abuse against the Maldonados, and DHS initiated an investigation into the matter. *See id.* ¶ 77. DHS investigator Ashley Wingate was assigned to handle the investigation. On June 13, 2016, after interviewing I.M. and the Maldonados and two in-home visits with her supervisor, Wingate closed the investigation finding I.M. was "safe" and the allegations of abuse were unfounded. *See id.* Ex. E. As a result of Wingate's investigation, the Maldonados began attending therapy as a family.

Approximately one month later, on July 12, 2016, I.M. ran away from the Maldonados' home. When Mrs. Maldonado contacted the Philadelphia Police Department about her daughter

leaving the home, an unknown detective from the Philadelphia Police Department informed her

that I.M. had gone to her maternal uncle Christopher Hermann's house in Maryland. *See id.* ¶ 91.

The detective also informed Mrs. Maldonado that I.M. had been in contact with the Marcuccis,

and Hermann told the department the Maldonados needed to emancipate I.M. or she would report

physical abuse to DHS again. *See id.* ¶ 95. Two days later, the Maldonados went to DHS, where

they were informed by a DHS employee, known to the Maldonados as Ms. Mary, that I.M. could

not return home until they were investigated for additional allegations of child abuse DHS had

received from an anonymous phone call. *See id.* ¶ 98. Mrs. Maldonado demanded to Ms. Mary

Hermann not allow I.M. to have any contact with the Marcuccis, Gibson, or Motion while the

investigation was ongoing. *See id.* ¶ 98. Ms. Mary agreed this condition was reasonable and

advisable, telling Mrs. Maldonado "good job, mom" after she set this condition and Hermann

agreed to the restriction. *See id.*

DHS investigator Roya Paller was assigned to the second DHS investigation. Paller knew

I.M. and the Marcuccis through her previous position as the Social Media Director at Party Rockers

Tween Scene, a youth club where Motion often held events that I.M. attended. *See id.* ¶ 103; *Id.*

Ex. D. On July 15, 2016, when Paller first visited the Maldonados' home, she told the Maldonados

I.M. looked familiar and knew of Motion because her daughters were involved in the "dance

world." *See id.* ¶ 106; *Id.* Ex. D. During this visit, Paller recommended Mrs. Maldonado agree to

a "safety plan," which permitted I.M. to remain with her uncle through August 31, 2018. *See id.* ¶

110. During this conversation Paller informed Mrs. Maldonado that if she did not agree to the

safety plan and abuse was found, Mrs. Maldonado could lose her nursing license. *See id.* ¶ 112.

After Paller's visit, Mrs. Maldonado consented to the safety plan on the condition I.M.

could not have any contact with the Marcuccis or Gibson, to which Paller and Hermann agreed.

4

*See id.* ¶ 113. However, during the investigation Mrs. Maldonado learned Hermann was allowing I.M. to contact the Marcuccis via social media and let I.M. have dinner with them while I.M. was on vacation with him in New Jersey. She further discovered an email from May 2016, before the first unfounded abuse allegation, from Gibson to I.M. stating "[Mr. Marcucci] and [Hermann] are working to get you out of there." *See id.* ¶ 96.

Mrs. Maldonado attempted to bring these issues to Paller's attention, but Paller failed to return her phone calls. *See id.* ¶ 114, 119. She also left voicemails for Javier Aguero, Paller's direct supervisor, but did not receive a response. When Mrs. Maldonado went to the DHS office to speak in person with Paller, she learned Paller was not in the office. After attempting to call then-Acting Commissioner Jessica Shapiro, Mrs. Maldonado was met by Aguero. Mrs. Maldonado explained her concerns to Aguero regarding Paller's investigation and Hermann's violation of the safety plan, who told her he would "handle it." *Id.* ¶ 125.

Shortly after Mrs. Maldonado met with Aguero, Paller informed Mrs. Maldonado the investigation could not move forward because Hermann refused to bring I.M. back to Pennsylvania. Mrs. Maldonado reported this to the Philadelphia Police Department, but was informed they could not do anything because DHS had informed them that Hermann had custody of I.M. On July 29, 2016, Paller provided Mrs. Maldonado with an ultimatum: either relinquish custody of I.M. or a charge of abuse would be entered against her and she would lose her nursing license. *See id.* ¶ 129. Mrs. Maldonado refused Paller's order. *See id.* Despite this refusal, Paller filed a report stating Mrs. Maldonado agreed to permanently allow Hermann to retain custody of I.M. *See id.* ¶ 130.

In early August 2016, Paller's investigation concluded with the finding that I.M. was "unsafe" because Mrs. Maldonado had diminished/absent cognitive, emotional, and behavioral

capacities resulting in her no longer wanting I.M. in her home, completely controlling I.M.'s life, and being unsupportive of I.M. *See id.* Ex. F. These conclusions, however, were contrary to Wingate's first investigation and did not account for how conditions had changed. *Compare id.* Ex. E (finding Mrs. Maldonado had no diminished capacities or parental skills) with *id.* Ex. F (finding diminished/absent cognitive, emotional, and behavioral).

Subsequently, on the advice of the DHS, Hermann filed a petition for custody of I.M. and a motion for expedited relief in the Philadelphia Court of Common Pleas. *See id.* Ex. H at 7. On August 11, 2016, Paller sent a letter to the Maldonados stating Hermann had filed for sole custody of I.M. and Mrs. Maldonado and DHS agreed to this course of action. *See id.* Ex. G. The same day, Paller sent a letter to the Maldonados stating the allegations of abuse in her investigation were unfounded. *See id.* ¶ 133. As a consequence, on August 29, 2016, Mrs. Maldonado wrote an email to Shapiro detailing her complaints with the Paller investigation. *See id.* Ex. I at 1-3. Shapiro did not respond to Mrs. Maldonado's email.

On September 16, 2016, Judge Diane Thompson of the Family Court of Philadelphia held a hearing on Hermann's motion for expedited relief. Paller attended this hearing with Hermann and I.M. but was instructed to leave by Judge Thompson. *See id.* Ex. H at 4. At the hearing, Judge Thompson determined Hermann had no standing to seek expedited relief as a non-parental third-party and, because the safety plan had expired, ordered I.M. to return to Mrs. Maldonado pending a full hearing on the petition. *See id.* Ex. H at 8-9. Following the hearing, I.M. attempted to leave the courthouse with Hermann and Paller, but they were stopped by court officers. *Id.* ¶ 147. I.M. refused to return to the Maldonados and conferred with Paller. *See id.*

6

Following this incident, Judge Thompson requested I.M. return to her courtroom. *See* Shapiro and Aguero's Mot. to Dismiss Ex. B at 3.[1] In this sua sponte hearing, I.M. represented that Mrs. Maldonado had swung at her with a bat and psychologically abused her while she lived with them, despite DHS's prior investigative findings that physical allegations of abuse were unfounded. *Id.* Ex. B at 4. The court entered an order for protective custody, ordered DHS to take I.M. into custody and file a dependency petition, and referred the matter to dependency court. *See id.* Ex. B at 6-7.

After this hearing, Mrs. Maldonado's attorney sent an email to Shapiro detailing the events of the hearing and Mrs. Maldonado's complaints with the DHS investigation. *See id.* Ex. I at 4. This email was sent to the same email address to which Mrs. Maldonado had previously sent the August 29, 2016, email. Shapiro replied this time, stating she would "certainly look into the issues" raised in the email. *See id.*

On September 19, 2016, Judge Vincent Furlong of the Philadelphia Court of Common Pleas held a shelter care hearing.[2] *See id.* Ex. J. At this hearing, DHS Supervisor Stacie Moultrie testified on behalf of the DHS and stated Paller was no longer involved in the investigation. *Id.*

---

[1] While the transcript of this ex parte hearing was not attached to the Amended Complaint, the Court may nevertheless consider it in deciding Defendants' motions to dismiss as its authenticity is not disputed by the parties and it is integral to the claims in the Amended Complaint. The Maldonados explicitly referenced this hearing in their Amended Complaint but did not attach the transcript as they did not have the transcript available at the time of filing, Am. Compl. ¶ 148 ("As a result of this ex parte proceeding (which Plaintiffs do not presently have a transcript for, Judge Thompson referred the case to dependency court."). *See Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) ("[D]ocument[s] integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." (internal quotation omitted)). Consequently, the Court will consider the transcript of the ex parte hearing before Judge Thompson.

[2] A shelter care hearing occurs after the DHS files a dependency petition. Its primary purpose is to evaluate the agency's contention that allowing the child to remain in the home would be detrimental to the child's welfare and best interest.

Moultrie testified she did not know why an order for protective custody was issued and that she "requested [Paller] not go" to the previous hearing before Judge Thompson. *See id.* Ex. J at 6-7. Hermann also provided testimony, stating he had allowed I.M. to meet with the Marcuccis numerous times on the basis Paller told him it was acceptable. *See id.* Ex. J at 23-24. Hermann also stated Paller had verified that his house was suitable for I.M. *See id.* Ex. J at 26. Judge Furlong ordered I.M. to stay with Hermann on a temporary basis and issued a no-contact order precluding Hermann from allowing I.M. to contact the Marcuccis, Gibson, or Motion. *See id.* Ex. J at 27-29.

On September 27, 2016, Judge Furlong held an adjudicatory hearing on the dependency petition.[3] Contrary to its previous position, DHS social workers provided that DHS had not verified Hermann's living arrangements until the day before the instant hearing and returning I.M. to Mrs. Maldonado's care was not contrary to I.M.'s best interests. *See id.* Ex. L. Judge Furlong ultimately awarded temporary legal custody to Hermann. Several months later, on February 14, 2017, I.M. turned 18-years-old, rendering the custody issue moot. I.M. subsequently had a disagreement with Hermann about attending college, and she now resides with the Marcuccis and works at Motion. *See id.* ¶ 169, 174-76.

Based on the foregoing, the Maldonados filed a Complaint against Defendants in this Court in April 2018. Defendants moved to dismiss the Complaint. As mentioned, the Maldonados subsequently filed an Amended Complaint on August 3, 2018, asserting different civil rights and tort claims against what can be characterized as four groups of Defendants: Paller and Aguero (the DHS Defendants), the Marcuccis, Gibson, and Motion (the Dance Defendants), then-DHS Commissioner Shapiro and the City of Philadelphia (the City Defendants), and I.M.'s uncle,

---

[3] An adjudicatory hearing is a bench trial before a judge or master who determines whether a child is dependent.

Hermann. Each group of Defendants has separately moved to dismiss all claims against them in the Amended Complaint, and the Court will address each group's motion to dismiss accordingly.

**DISCUSSION**

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the facts pleaded "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In evaluating a Rule 12(b)(6) motion, a court first must separate the legal and factual elements of the plaintiff's claims. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). The court "must accept all of the complaint's well-pleaded facts as true," *id.* at 210-11, but need not accept "bald assertions" or "legal conclusions" made in plaintiff's papers, *see In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429-30 (3d Cir. 1997) (citation omitted). The court must then "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). To satisfy this standard, the complaint must contain enough factual matters to suggest the required elements of the claim or to "raise a reasonable expectation that discovery will reveal evidence of" those elements. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).

A.    **Roya Paller and Javier Aguero**[4]

    i.    *Section 1983 - Substantive Due Process Claims*

In Count I, Mrs. Maldonado brings a § 1983 claim against Paller, in her individual and official capacity, for violating her substantive due process rights under the Fourteenth Amendment. In addition, Count III[5] includes a substantive due process claim against Aguero, in his official and individual capacity, based on his alleged knowledge and acquiescence in Paller's alleged violations of Mrs. Maldonado's Fourteenth Amendment rights. The DHS Defendants, Paller and Aguero, move to dismiss the Counts against them on the grounds of (1) collateral estoppel, (2) receipt of adequate due process; (3) failure to state a claim upon which relief may be granted; and (4) qualified immunity.

At the outset, the DHS Defendants' collateral estoppel argument is unpersuasive. They contend Mrs. Maldonado is barred from bringing her substantive due process claims because collateral estoppel prevents her from overturning a state custody determination. Mrs. Maldonado, however, is not seeking to overturn the state court's custody determination. Rather, her claims stem from the DHS Defendants' actions that ultimately resulted in her losing custody of I.M. Mrs.

---

[4] The Court notes the Maldonados brought claims against Paller and Aguero in their individual and official capacity. Official capacity claims, however, are duplicative of claims against the City. Because official capacity claims require allegations that a policy or custom of the governmental entity was the moving force behind violations of Constitutional or federal law, "official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (quoting *Monell v. Dept. of Soc. Servs. of N.Y*, 436 U.S. 658, 690 n.55 (1978)). Because claims against the Department of Human Services are considered claims against the City, *see Tazioly v. City of Phila.*, No. 97-1219, 1998 WL 633747, at *13 n.9 (E.D. Pa. Sept. 10, 1998), the Court will dismiss the official capacity claims against Paller and Aguero. *See id.* (treating claims against DHS employees in their official capacity as claims against the City).

[5] Count III also includes claims against then-Acting Commissioner Jessica Shapiro, which will be addressed further below.

Maldonado is seeking to assert her rights based on Defendants' actions and is not asking this Court

to overturn any state court ruling. Collateral estoppel therefore does not apply. *See Dennis v.*

*DeJong*, 867 F. Supp. 2d 588, 620 (E.D. Pa. 2011) (refusing to dismiss § 1983 and state tort action

on the grounds of collateral estoppel where the plaintiff's claims stemmed from a child abuse

investigation).

The DHS Defendants' assertion that Mrs. Maldonado cannot bring a Fourteenth

Amendment substantive due process claim because she received proper due process through the

formal DHS investigation and Pennsylvania state court custody determination is similarly

misguided. The DHS Defendants' argument misconstrues Mrs. Maldonado's claim. Mrs.

Maldonado is not claiming her procedural due process rights were violated. Rather, Mrs.

Maldonado is claiming she was denied her substantive due process rights as a parent due to the

wrongful actions taken by the DHS Defendants. Therefore, the DHS Defendants' assertion that

Mrs. Maldonado received proper procedural due process is inapplicable to the substantive due

process claim.

Next, the DHS Defendants' argument that the Amended Complaint fails to state a

substantive due process violation of her Fourteenth Amendment rights pursuant to § 1983 also

fails.[6] The Third Circuit has recognized that natural parents have a fundamental liberty interest in

the "care, custody, and management of their child," a protected interest under both the procedural

and substantive due process components of the Fourteenth Amendment. *Miller v. City of Phila.*,

174 F.3d 368, 373 (3d Cir. 1999). With respect to substantive due process, "a child welfare agency

---

[6] Although the DHS Defendants assert they are entitled to qualified immunity for Mrs.
Maldonado's § 1983 claims, the Court must first determine whether Mrs. Maldonado has
sufficiently pled her § 1983 claim. *See Larsen v. Senate of the Commw. of Pa.*, 154 F.3d 82, 86
(3d Cir. 1998) ("[W]hen a qualified immunity defense is raised a court first should determine
whether the plaintiff has asserted a violation of a constitutional right at all.").

abridges an individual's substantive due process rights when its actions exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed shocks the conscience." *Mulholland v. Gov't Cty. of Berks*, 706 F.3d 227, 241 (3d Cir. 2013). A state agency social worker who removes a child upon suspicions of abuse is liable for a substantive due process violation when he or she "consciously disregard[s] a great risk that there had been no abuse." *DeJong*, 867 F. Supp. 2d at 620 (citing *Ziccardi v. City of Phil.*, 288 F.3d 57, 66 (3d Cir. 2002)). Similarly, the supervisor of a state agency social worker who violates a parent's substantive due process rights may be held liable for the social worker's violation if the supervisor (1) had knowledge of the alleged wrongdoing; and (2) acquiesced in the commission of the wrongdoing. *See McKenna v. City of Phila.,* 582 F.3d 447, 460-61 (3d Cir. 2007) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). Mrs. Maldonado has sufficiently pled her § 1983 substantive due process claim against Paller.

In *Croft v. Westmoreland County Children & Youth Services,* 103 F.3d 1123 (3d Cir. 1997), the Third Circuit held the plaintiff pled a valid substantive due process claim where the social worker threatened to remove a child from the plaintiff's home if he did not leave based on an unsubstantiated telephone accusation. *Id.* at 1125. Like in *Croft*, Mrs. Maldonado alleges (1) Paller investigated her despite Paller having a conflict of interest in the investigation through her prior relationship with I.M. and the Marcuccis, Gibson, and Motion, *see* Am. Compl. Ex. D; (2) disregarded an investigation conducted less than two months prior finding no abuse, *see id.* Exs. E, F; (3) failed to adequately maintain a proper investigation and safety plan preventing I.M. from contacting the Marcuccis, *see id.* Ex. J at 23-24; and (4) reported incorrect statements and false information regarding the investigation and custody of I.M., *see id.* ¶ 129, Ex. G, which ultimately led to dependency proceedings and her losing custody of I.M. These facts provide a sufficient basis

to infer that Paller disregarded a "great risk" there was no abuse. *See DeJong*, 867 F. Supp. 2d at 620.

Similarly, the Amended Complaint also sufficiently pleads a § 1983 claim with respect to Aguero. In this instance, Aguero approved each report Paller generated regarding her investigation, *see id.* Ex. F, and spoke to Mrs. Maldonado in person on July 26, 2016, about Paller's alleged misconduct, *see id.* ¶ 125. The Amended Complaint further alleges Aguero failed to take any action in response to any of Paller's reports or his meeting with Mrs. Maldonado meeting. These facts sufficiently allege Aguero knew of Paller's misconduct and acquiesced in it. Consequently, the Amended Complaint properly alleges a § 1983 substantive due process claim against the DHS Defendants.

Turning to the DHS Defendants' qualified immunity argument, the Court finds it cannot rule on the qualified immunity issue based on the limited record before it.[7] "[Q]ualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010) (internal quotations omitted). Government officials are not liable under § 1983 "as long as their actions reasonably could have been thought consistent with the rights they are alleged to have violated." *Kedra v. Shroeter*, 876 F.3d 424, 434 (3d Cir. 2017). Qualified immunity is an affirmative defense for which

---

[7] Qualified immunity is a fact-specific inquiry. *See Thomas v. Indep. Twp.*, 463 F.3d 299-300 (3d Cir. 2006). Although the Court is required to take the facts in the Amended Complaint as true at the motion to dismiss stage, when immunity cannot be clearly established or abrogated based on the face of the complaint, i.e. when there are sufficient allegations to overcome qualified immunity but they are contested or insufficient on their own to allow the court to engage in a full analysis of the issue, the Court should withhold ruling on the immunity issue. *See Zion v. Nassan*, 727 F. Supp. 2d 388, 404-05 (W.D. Pa. 2010).

the defendants bear the burden of proof. *See Brown v. Cwynar*, 484 F. App'x 676, 680 (3d. Cir. 2012).

In deciding whether qualified immunity applies, the Court must consider two questions: "First, the constitutional question is 'whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right'[;] . . . Second, the qualified immunity question is 'whether the right at issue was "clearly established" at the time of a defendant's alleged misconduct.'" *Southerland v. Pennsylvania*, 389 F. App'x 166, 170 (3d Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The first prong is a "factual question," which is appropriate for juries to decide, while the second prong should be decided by courts. *Curley v. Klem*, 499 F.3d 199, 211 (3d Cir. 2007).

While the Supreme Court has directed courts to address the issue of qualified immunity at the "earliest possible stage in the litigation," *Hunter v. Bryant*, 502 U.S. 224, 227 (1991), a court should not rule on a claim of qualified immunity if material facts relating to the issue are in dispute or the facts in the complaint do not allow for the court to engage in a full analysis. *See Newland v. Reehorst*, 328 F. App'x 788, 791 n.3 (3d Cir. 2009) (cautioning it is "unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases"). A court may defer a qualified immunity decision at the motion to dismiss stage if it identifies (1) the constitutional right infringed upon was clearly established at the time; and (2) facts material to the qualified immunity analysis are in dispute. *See Conte v. Rios*, 658 F. App'x 639, 642-43 (3d Cir. 2016) (overturning the district court's decision to defer ruling on a question of qualified immunity where it found the plaintiff's constitutional right was clearly established but failed to identify specific facts in dispute justifying deferral of the qualified immunity issue).

14

In this instance, deferral of the qualified immunity question is appropriate because, while the constitutional right infringed upon is clearly established, material facts relating to the qualified immunity analysis remain in dispute. First, the DHS Defendants have conceded that Mrs. Maldonado's constitutional right to the "care, custody, and control" of her child was clearly established at the time of the DHS Defendants' actions. Thus, the legal prong of the qualified immunity test is established and only the factual question remains. However, whether the DHS Defendants knowingly violated Mrs. Maldonado's constitutional rights and "consciously disregarded a great risk there was no abuse" cannot be affirmatively resolved based on the face of the Amended Complaint and its exhibits.

For example, Mrs. Maldonado alleges DHS Defendants knowingly violated her constitutional rights and consciously disregarded a great risk there was no abuse by (1) ignoring Wingate's initial investigatory finding of no abuse without reason, *see* Am. Comp. Ex. F; (2) allowing Paller to conduct the investigation when she knew she had a conflict-of-interest by knowing I.M. and the Dance Defendants previously, *see id.* Ex. D; (3) knowingly allowing Hermann to violate the safety plan and making false statements to Mrs. Maldonado at the September 17, 2016 hearing, *see id.* ¶ 96, 110, 114; Ex. J at 23-24; and (4) consciously failing to act in response to Mrs. Maldonado's numerous complaints, *see id.* ¶ 125. As the DHS Defendants disputed the veracity of these allegations in their motion to dismiss and at the October 31, 2018, oral argument on the motion, however, there is an insufficient basis to conclusively find the allegations are false because the Amended Complaint and its exhibits, taken as true, set forth a plausible basis supporting the allegations. However, at this stage, there is an insufficient basis to conclusively find the allegations are true to justify abrogating the DHS Defendants' qualified immunity. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 242 n.7 (3d Cir. 2008) ("A decision as

to qualified immunity is 'premature when there are unresolved disputes of historical facts relevant to the immunity analysis.'"). Accordingly, because a determination on the face of the Amended Complaint would be premature, the Court will defer ruling on the DHS Defendants' qualified immunity argument and Count I and Count III—as it relates to Aguero—of the Amended Complaint both survive the DHS Defendants' motion to dismiss.

      *ii.*    *Common Law Tort Claims*

The Maldonados next assert various common law tort claims against the DHS Defendants. Count V brings an intentional infliction of emotional distress claim against Paller and Aguero on behalf of the Maldonados. In Counts VI and VII, Mrs. Maldonado individually brings a negligent supervision claim against Aguero and a common law fraud claim against Paller. In Count VIII, the Maldonados bring a civil conspiracy claim against Paller. Finally, in Count IX, Mr. Maldonado brings a loss of consortium claim against Paller and Aguero. The DHS Defendants contend these claims are barred by Pennsylvania's Political Subdivision Tort Claims Act (TCA), 42 PA. CONS. STAT. §§ 8541, et seq.

The TCA governs the tort liability of a municipality and municipal employees acting within the scope their employment. The TCA provides general immunity from tort liability, as follows:

> Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person.

42 PA. CONS. STAT. § 8541 (2018). The TCA, however, also provides for a limited waiver in certain circumstances, including "where the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct." *Id.* § 8550.

At this stage of the litigation, like the DHS Defendants' assertion of qualified immunity, a determination of TCA immunity would be premature. Namely, Mrs. Maldonado asserts the DHS

16

Defendants acted with "willful misconduct" in committing the alleged torts, and based on the facts

pleaded in the Amended Complaint and its exhibits—taken as true—there is sufficient basis to

support an assertion of willful misconduct. Still, the factual record is limited, and it is thus difficult

to properly ascertain the true intent of the DHS Defendants' conduct. As a result, the Court will

withhold ruling on the DHS Defendants' TCA immunity argument as to the common law tort

claims.[8] *See Sanford v. Stiles*, No. 03-5698, 2004 WL 2579738, at *14-15 (E.D. Pa. Nov. 10, 2004)

(determining TCA immunity at the summary judgment stage after denying defendants' motion to

dismiss because plaintiff sufficiently alleged willful misconduct). Notwithstanding the DHS

Defendants immunity argument, some of the Maldonados' common law tort claims must be

dismissed for failure to state a claim.[9]

As mentioned, in Count V, the Maldonados bring a claim for intentional infliction of

emotional distress (IIED) based upon the emotional damages they suffered as result of Mrs.

Maldonado losing custody of I.M. and the actions of the DHS Defendants. "To establish a prima

facie intentional infliction of emotional distress claim, [a] plaintiff must plead facts supporting

---

[8] Insofar as the DHS Defendants contend that Mrs. Maldonado cannot maintain a negligent
supervision claim because the claim implies a requisite showing of negligence, and not willful
misconduct as required to abrogate TCA immunity, their argument fails in light of *McNeal v. City
of Easton*, 598 A.2d 638, 641-41 (Pa. Comm. Ct. 1991). In *McNeal*, the Pennsylvania
Commonwealth Court noted that a negligent supervision claim could survive if the plaintiff pleads
"willful misconduct" and abrogates the TCA immunity. *Id.* at 641. Thus, the negligent supervision
claim is not per se barred by the TCA.

[9] The Court notes the DHS Defendants did not argue the claims discussed below fail because they
do not state a claim upon which relief may be granted. However, because other Defendants have
argued the points set forth below and because allowing the claims to proceed against the DHS
Defendants would be inconsistent with the Court's rulings on the remaining motions to dismiss,
the Court will address them below.
    Furthermore, because neither the DHS Defendants, nor any of the other Defendants, assert
Mrs. Maldonado's fraud claim against Paller in Count VII fails to state a claim, this claim will not
be further addressed and will be permitted to proceed.

three elements: (1) a person who by extreme and outrageous conduct (2) intentionally or recklessly causes (3) severe emotional distress to another." *Mantua Cmty. Planners v. City of Phila.*, No. 12-4799, 2013 WL 6506312, at *8 (E.D. Pa. Dec. 11, 2013). Plaintiffs who claim they suffered emotional distress must substantiate these claims with competent medical evidence. *See Dennis*, 867 F. Supp. 2d at 660 (citing *Hunger v. Grand Cent. Sanitation*, 670 A.2d 173, 177 (Pa. Super. Ct. 1996)).

The Maldonados' IIED claim fails because they have not provided competent medical evidence of the distress they suffered. In this instance, the Maldonados have failed to proffer any medical evidence demonstrating emotional distress. *See id.* (dismissing an IIED claim where "[p]laintiffs merely contend that they suffered depression and anxiety, without alleging expert medical confirmation . . . "). The Maldonados' IIED claim against the DHS defendants will be dismissed without prejudice for failure to plead competent medical evidence of the emotional distress suffered.

In Count VIII, the Maldonados bring a common law civil conspiracy claim alleging Paller was involved in a conspiracy with the Marcuccis, Gibson, Motion, and Hermann to cause them extreme emotional distress. Because a claim for civil conspiracy cannot be pled without also sufficiently alleging an underlying tort in Pennsylvania, *see McGreevy v. Stroup*, 413 F.3d 359, 371 (3d Cir. 2005), their civil conspiracy claim must also fail.

Finally, in Count IX, Mr. Maldonado brings a loss of consortium claim against the DHS Defendants for the loss he suffered as a result of the emotional trauma they allegedly caused to his wife, Mrs. Maldonado. Under Pennsylvania law, an action for loss of consortium is derivative of an injured party's claims. *Tiernan v. Devoe*, 923 F.2d 1024 (3d Cir. 1991). The success of a derivative claim is "always dependent upon the injured [spouse's] right to recover" on other

successful claims. *Nationwide Mut. Ins. Co. v. Consenza*, 258 F.3d 197, 206 (3d Cir. 2001). As Mr. Maldonado's loss of consortium claim is derivative of Mrs. Maldonado's IIED claim, which was not sufficiently alleged, it must also fail.

**B.    Thomas Marcucci, Staciann Marcucci, Jessica Gibson, and Motion N' Dance**

    *i.    Corporate Liability*

In Count II, Mrs. Maldonado brings a § 1983 conspiracy claim against Motion. In addition, in Count VIII, the Maldonados bring a common law civil conspiracy claim against Motion. The Dance Defendants—Thomas Marcucci, Staciann Marcucci, Jessica Gibson, and Motion—move to dismiss these claims on the basis the Amended Complaint fails to state a claim against the corporate defendant. All claims against Motion will be dismissed as there is no basis for liability to be imposed on the dance studio.

The Amended Complaint sets forth no facts showing the Dance Defendants were acting pursuant to a policy, practice, or custom of Motion, nor is there evidence the Dance Defendants' actions were taken in their official capacities as employees of Motion. *See Weigher v. Prison Health Servs.*, 402 F. App'x 668, 669-670 (3d Cir. 2010) (holding private health services corporation could not be held liable for the actions of its employees in rendering medical care because plaintiff did not allege "a policy, practice, or custom" and the corporation could not be held liable on the basis of respondeat superior); *Brezenski v. World Truck Transfer, Inc.*, 755 A.2d 36, 39 (Pa. Super. Ct. 2000) ("Under Pennsylvania law, '[a]n employer is vicariously liable for the wrongful acts of an employee if that act was committed during the course of and within the scope of employment.'"). For this reason, all claims against Motion will be dismissed with prejudice.

ii.    *Section 1983 - Civil Conspiracy Claim*

In Count II, Mrs. Maldonado brings a §1983 conspiracy claim against the Dance Defendants for conspiring with Paller to violate Mrs. Maldonado's substantive due process rights under the Fourteenth Amendment. A § 1983 conspiracy claim requires proof that two or more conspirators reached an agreement to deprive plaintiff of a constitutional right under color of law. *Williams v. Fedor*, 69 F. Supp. 2d 649, 666 (M.D. Pa. 1999), *aff'd*, 211 F.3d 1263 (3d Cir. 2000). To set forth a conspiracy claim under § 1983, a plaintiff must allege (A) an actual violation of a right protected under § 1983 and (B) actions taken in concert by defendants with the specific intent to violate the right protected under section 1983. *Id.* The Dance Defendants assert the Amended Complaint fails to state a civil conspiracy claim pursuant to § 1983.

The Amended Complaint, however, pleads a valid § 1983 civil conspiracy claim because it (1) names the Dance Defendants as original members of the conspiracy; (2) demonstrates the object of the conspiracy was to deprive Mrs. Maldonado of the custody and care of I.M. in retaliation for preventing I.M. from dancing with Motion; (3) avers the conspiracy began in or around May 2016 when Mrs. Maldonado informed I.M. she could not dance at Motion and I.M. received an email from Gibson stating, "Tommy and your uncle are working to get you out of there," Am. Comp. ¶ 96; and (4) sets forth a factual basis to infer that Paller, as person acting under color of state law, initiated the second DHS investigation at the direction of the Dance Defendants and the Dance Defendants were acting in concert with Paller and Hermann to deny Mrs. Maldonado her right to substantive due process pursuant to the Fourteenth Amendment. Consequently, Count II for civil conspiracy pursuant to § 1983 against the Dance Defendants may proceed.

iii.    *Common Law Tort Claims*

Turning to the state law claims against the Dance Defendants, the Maldonados' IIED claim in Count V, Mrs. Maldonado's common law civil conspiracy claim in Count VIII, and Mr. Maldonado's loss of consortium claim in Count IX, these claims fail for the same reason they failed against the DHS Defendants: the Maldonados' IIED claim fails because they did not submit substantiating medical evidence, which causes Mrs. Maldonado's pendant civil conspiracy claim and Mr. Maldonado's loss of consortium claim to also fail for lack of an underlying tort. As such, the IIED claim in Count V, the civil conspiracy claim in Count VIII, and the loss of consortium claim in Count IX, will be dismissed without prejudice.[10]

---

[10] The Dance Defendants have also moved to strike certain paragraphs and exhibits from the Amended Complaint, arguing the Amended Complaint inappropriately characterizes them as "child predators" who were "grooming" I.M. Mot. Strike. 1. They assert these allegations have no bearing on whether they conspired with Paller to deprive the Maldonados of custody of I.M. or the accompanying state law claims and must thus be removed.

Pursuant to Federal Rule of Civil Procedure 12(f), district courts have discretion to grant a motion to strike when a pleading contains allegations or defenses that have no possible relation to the controversy, confuse the issues in the case, or cause unfair prejudice to one of the parties. *See, e.g.*, *Vay v. Huston*, No. 14-769, 2015 WL 4461000, at *4 (W.D. Pa. July 21, 2015). Relief under Rule 12(f) is generally disfavored. *Simmons v. Simpson House, Inc.*, 224 F. Supp. 3d 406, 421 (E.D. Pa. 2016).

The Dance Defendants' motion to strike will be denied because the alleged improper allegations are relevant to the claims at issue because allegations of the close relationship the Dance Defendants had with I.M. bears on the influence they had over her and their ability to persuade I.M. to fabricate the alleged false claims of abuse—which directly relate to the claims in the Amended Complaint. *See Fox v. Lackawanna Cty.*, No. 16-1511, 2017 WL 5007905, at *11 (M.D. Pa. Nov. 2, 2017) (refusing to strike allegedly false prior allegations of sexual abuse and rape of female inmates by corrections officers as they were relevant to the plaintiffs' constitutional rights claims). Moreover, an assertion that factual allegations are false is insufficient to serve as the basis for a motion to strike. *See id.* (citing *Boyd v. United States*, 861 F.2d 106, 109 (5th Cir. 1988) (holding falsity of a pleading does not provide a sufficient basis for granting a motion to strike under Rule 12(f))). As a result, the Dance Defendants' motion to strike will be denied.

C.       **Jessica Shapiro and the City of Philadelphia**[11]

      i.       *Section 1983 - Substantive Due Process and* Monell *Claims*

Counts III and IV allege violations of Mrs. Maldonado's right to substantive due process against Jessica Shapiro and the City of Philadelphia (the City Defendants). The City Defendants move to dismiss these claims for failure to state a claim upon which relief may be granted.

First, as to Shapiro, the City Defendants contend the substantive due process claim pursuant to § 1983 in Count III must be dismissed because Mrs. Maldonado improperly seeks to impose vicarious liability on Shapiro. Shapiro's argument, however, is belied by *McKenna v. City of Philadelphia*, 582 F.3d 447 (3d Cir. 2009). As previously explained while analyzing this claim against the DHS Defendants, in *McKenna*, the court held that a supervisor may be liable if he or she has knowledge of the alleged conduct and acquiesces in it but in the instance before the court, the police supervisor could not be held liable for an excessive force claim where plaintiff merely alleged the supervisor was present "in the vicinity after [the plaintiff's] arrest." *Id.*

Taking the well-pleaded facts as true, in contrast to *McKenna*, Shapiro had constructive knowledge of the misconduct allegations against Paller and Aguero based upon the August 29, 2016, email Mrs. Maldonado sent, and actual knowledge of the misconduct allegations based on the September 16, 2016, email Mrs. Maldonado's attorney sent. Am. Comp. Ex. I. Thus, Shapiro had knowledge of Paller's misconduct and Aguero's inaction before the final custody determination was made. However, as pled in the Amended Complaint, she failed to act on any of

---

[11] The Court notes the Maldonados brought claims against Shapiro in her individual and official capacity. As previously discussed, official capacity claims are duplicative of claims against the City. Because these claims are duplicative, the Court will dismiss the official capacity claims against Shapiro. *See Kentucky*, 473 U.S. at 185 (holding official capacity suits are "not [suits] against the official personally, for the real party in interest is the [entity]"); *Tazioly*, 1998 WL 633747, at *13 n.9 (treating claims against DHS employees in their official capacity as claims against the City).

the allegations of wrongdoing and therefore acquiesced in them. Accordingly, Mrs. Maldonado's substantive due process claim in Count III may proceed.[12] *See McKenna*, 582 F.3d at 447.

As to the City, the City Defendants contend the substantive due process claim fails because the Amended Complaint does not plead a valid claim for municipal liability. To establish municipal liability under § 1983, a plaintiff must show she was deprived of rights, privileges, or immunities secured by the Constitution and laws of the United States, and the deprivation of those rights was the result of an official government policy or custom. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). A policy is "a decision of a municipality's duly constituted legislative body or of officials whose acts may fairly be said to be those of the municipality," while a custom is "a practice that, although not . . . formally approved by an appropriate decisionmaker . . . is so widespread as to have the force of law." *B.S. v. Somerset Cty.*, 704 F.3d 250, 274 (3d Cir. 2013) (internal quotation marks omitted).

The Amended Complaint sufficiently pleads a *Monell* claim by establishing a custom based upon a 2016 Pennsylvania Department of Health Services audit of the Philadelphia DHS.[13] Specifically, the December 16, 2016, audit found "[s]upervision of case workers was not completed consistently in 5 cases out of 31 records reviewed . . . This was a previous[] cite on [the] 1st provisional [letter] . . . involving only one case . . . This is now found in [5 cases]." Shapiro and the City's Resp. in Opp'n Ex. A at 12-13. The audit further stated "DHS must have

---

[12] The Court notes that, although she was an employee of the City at the relevant time, Shapiro has not set forth any qualified immunity argument at this stage of the litigation.

[13] Although the Maldonados did not attach the content of the Pennsylvania DHS audit to their Amended Complaint, they explicitly referenced it in the Amended Complaint, *Id.* ¶ 187-88, and it is a public record. Therefore, the Court may consider the content of the DHS audit. *See Walthour v. Miller*, No. 09-5289, 2010 WL 2572626, at *5 (E.D. Pa. June 22, 2010) (citing *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004)) ("In deciding a motion to dismiss, a court may consider documents outside of the complaint, such as matters of public record, court orders, and documents that form the basis of the claim.").

ongoing support and direction for case activities in all cases . . . This repeat violation area should be addressed" and found a systemic failure of the DHS to ensure DHS supervisors and social workers received proper case management training. *See id.* at 18- 22. Ultimately, the audit resulted in a downgrade of the DHS's state license. *See id.* at 6-7.

Based upon the audit, the Amended Complaint sufficiently pleads a *Monell* claim against the City. Pursuant to the audit, the Amended Complaint provides a factual basis to find the DHS had a custom of failing to supervise and train its employees, which Mrs. Maldonado alleges resulted in a violation of her Fourteenth Amendment substantive due process rights when she lost custody of I.M. due to Paller's unsupervised actions. *Cf. Cavicchia v. Phila. Hous. Auth.*, No. 03-0116, 2003 WL 22595210, at *13 (E.D. Pa. Nov. 7, 2003) (granting summary judgment on plaintiff's *Monell* claim where "[p]laintiff . . . [did] not come forward with any affirmative evidence regarding a municipal policy or custom of inadequate training or supervision or the deliberate indifference of officials in adopting any such policy or custom"). Therefore, Mrs. Maldonado's *Monell* claim against the City in Count IV may proceed.

   *ii. Common Law Tort Claims*

Turning to the state law claims against the City Defendants for IIED in Count V, negligent supervision in Count VI, and loss of consortium in Count IX, the City Defendants argue these claims are barred by the TCA, which provides for limited tort liability for municipalities and municipal employees with a narrow exception applying to employees who act with "actual fraud, actual malice, or willful misconduct." *See* 42 PA. CONS. STAT. § 8550 (2018). This narrow exception, however, does not extend to the municipality itself. *See Rodriguez v. City of Phila.*, No. 94-1450, 1995 WL 66889, at *2 (E.D. Pa. Feb. 14, 1995) (collecting cases).

24

The TCA thus bars the claims for IIED in Count V, negligent supervision in Count VI, and loss of consortium in Count IX against the City. The Maldonados' claim they have alleged willful misconduct and invoked the exception to the TCA in § 8550 is without merit, and their claims against the City in Counts V, VII, and IX must be dismissed with prejudice. *See Bianchi v. City of Phila.*, 183 F. Supp. 2d 726, 747-48 (E.D. Pa. 2002) (barring a plaintiff's IIED claim against a city fire department because it did not fall within the TCA exception); *Kessler v. Monsour*, 865 F. Supp. 234, 241 (M.D. Pa. 1994) (finding state municipalities are wholly immune from intentional torts unless the TCA waives immunity or the actor is an employee and acts pursuant to § 8550).

Turning to Shapiro, while the TCA does not bar her liability for IIED in Count V, negligent supervision in Count VI, and loss of consortium in Count IX due to the potential application § 8550 willful misconduct exception because she is an employee of the City and alleged to have acted with willful misconduct, only the negligent supervision claim will survive and any determination as to whether TCA immunity is applicable to that claim will be deferred given the limited factual record before the Court.[14] The IIED and loss of consortium claims, however, must be dismissed for the same reasons they were dismissed against the DHS Defendants and Dance Defendants. Specifically, the IIED claim in Count V must be dismissed for the failure to plead competent medical evidence substantiating the claim, *see Dennis*, 867 F. Supp. at 660 (dismissing an IIED claim where "[p]laintiffs merely contend that they suffered depression and anxiety, without alleging expert medical confirmation . . . "), and the loss of consortium claim must be dismissed

---

[14] As discussed above, to the extent the City Defendants argue a negligent supervision claim cannot abrogate TCA immunity, this argument is meritless. Although a negligent supervision typically requires a showing of negligence to proceed, a plaintiff may plead willful misconduct and avoid a municipal employee's TCA immunity. *See McNeal*, 598 A.2d at 641-42 (noting a plaintiff may avoid TCA immunity by pleading the defendant acted pursuant to the exception set forth in § 8550).

as a dependent claim of the IIED claim, *see Nationwide Mut. Ins. Co.*, 258 F.3d at 206 (providing the success of a loss of consortium claim is dependent on the success of the spouse's underlying tort claim).

### D.    Christopher Hermann

#### i.    *Section 1983 – Civil Conspiracy Claim*

In Count II, Mrs. Maldonado brings a §1983 conspiracy claim against Hermann for conspiring with Paller and the Dance Defendants to violate Mrs. Maldonado's substantive due process rights under the Fourteenth Amendment. Hermann contends this claim must be dismissed for failure to state a claim.[15] As noted, to set forth a conspiracy claim under § 1983, a plaintiff must allege (A) an actual violation of a right protected under § 1983 and (B) actions taken in concert by defendants with the specific intent to violate the right protected under section 1983. *Williams*, 69 F. Supp. 2d at 666.

The Amended Complaint satisfies this standard by (1) naming Hermann as an original member of the conspiracy; (2) demonstrating the object of the conspiracy was to deprive Mrs. Maldonado of the custody and care of I.M. in retaliation for preventing I.M. from dancing with Motion; (3) averring the conspiracy began in or around May 2016 and specifically stating Herman was working with Mr. Marcucci to get I.M. out of the home, *id.* ¶ 96; (4) showing numerous contacts and coordination between Hermann and Paller, *id.* Ex. H, Ex. E; and (5) setting forth a factual basis to infer that Paller initiated the second DHS investigation at the direction of the Dance Defendants and the Dance Defendants were acting in concert with Paller and Hermann to have

---

[15] Footnote 1 of Hermann's motion states that he joins in the collateral estoppel argument raised by the DHS Defendants. For the reasons previously set forth, collateral estoppel does not bar the Maldonados from raising any of the claims in their Amended Complaint. *See Dennis*, 867 F. Supp. 2d at 620 (refusing to dismiss § 1983 and state tort action on the grounds of collateral estoppel where the plaintiff's claims stemmed from a child abuse investigation).

I.M. removed from the Maldonados' home. These facts, taken as true, also plead a specific intent

to violate Mrs. Maldonado's parental rights pursuant to the Fourteenth Amendment. Thus, the

Amended Complaint sets forth a valid § 1983 civil conspiracy claim.

> ii.    *Common Law Tort Claims*

In Count V, the Maldonados bring an IIED claim against Hermann. Count VII brings a

common law fraud claim on behalf of Mrs. Maldonado. In Count VIII, the Maldonados assert a

common law civil conspiracy claim. Last, Count IX sets forth a loss of consortium claim on behalf

of Mr. Maldonado.

Hermann initially argues Mr. Maldonado's IIED, civil conspiracy, and loss of consortium

claims should be dismissed because he lacks standing to bring his claims. "A motion to dismiss

for want of standing is . . .  properly brought pursuant to Rule 12(b)(1), because standing is a

jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007); Fed. R. Civ.

P. 12(b)(1) (providing a party may move to have a complaint dismissed because the court lacks

subject-matter jurisdiction). Generally, a step-parent lacks standing to bring claims involving the

parental rights of a step-child because they do not have a legal relationship with the step-child. *See*

*Brown v. Daniels*, 290 F. App'x 467, 474 (3d Cir. 2008) (holding a step-father could not assert a

violation of his due process rights because he "had no legal relationship with [his step-child]").

Hermann argues Mr. Maldonado did not have any parental rights over I.M. as her step-

father at the time of the relevant events and, therefore, cannot sue on the basis of a loss of parental

rights. *See Bayer v. Monroe Cty. Children & Youth Servs.*, 414 F. App'x 431, 435 n.5

(3d Cir. 2011) (holding a step-father lacks any legal or other right to the custody of his step-

children). Hermann's argument, however, is misguided as the only claims Mr. Maldonado asserts

in the Amended Complaint are the IIED claim in Count V, the common law civil conspiracy claim

in Count VIII, and the loss of consortium claim in Count IX. These claims do not require Hermann to have any parental rights to pursue and are independent of any substantive due process claims set forth in the Amended Complaint. Hermann's argument that Mr. Maldonado lacks standing to sue because he is the step-father of I.M. is meritless.

Hermann next moves to dismiss the common law fraud claim against him on the basis it is not pled with particularity. To plead a fraud claim, a plaintiff must establish the following elements: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Kit v. Mitchell*, 717 A.2d 814, 819 (Pa. Super. Ct. 2001). Rule 9(b) of the Federal Rules of Civil Procedure also requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." *Ca. Pub. Emps. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004). Under this particularity requirement, a plaintiff asserting a fraud claim must specify "the who, what, when, where, and how: the first paragraph of any newspaper story." *Id.*

The Amended Complaint in this instance satisfies the Rule 9(b) pleading standard to state a claim for common law fraud. The Amended Complaint alleges Hermann represented to Mrs. Maldonado he would not allow I.M. to contact the Dance Defendants, Am. Compl. ¶ 98; this representation was material to Mrs. Maldonado and she justifiably relied upon it when agreeing to the safety plan which ultimately resulted in Hermann being able to challenge her custody, *id.*; Hermann knew the representation was false when he made it due to his previous contacts with the Marcuccis, *id.* ¶ 96; Hermann acknowledged this representation and agreement in his testimony in the underlying proceedings, *id.* Ex. J at 23-24; and Hermann conceded he let I.M. meet with the

28

Dance Defendants multiple times, including while they were on vacation in New Jersey, *id.* These facts allege the "who, what when where, and how" and therefore, the Amended Complaint sets forth a sufficient factual basis to maintain a fraud claim.

Lastly, for the reasons previously discussed in the other sections above, the IIED claim in Count V, the civil conspiracy claim in Count VIII, and the loss of consortium claim in Count IX will be dismissed against Hermann without prejudice.

**CONCLUSION**

For the reasons set forth above, the DHS Defendants, the Dance Defendants, the City Defendants, and Hermann's individual motions will be granted in part and denied in part.

An appropriate order follows.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, C.J.