| | | |
|---|---|---|
| MARK R. POTASH, Individually and as Co-Administrator of the Estate of MARK R. STURGIS, deceased, and AIMEE L. KING, Individually and as Co-Administrator of the Estate of MARK R. STURGIS, Deceased | : : : : : | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| | : | December Term, 2017 |
| | : | No. 2942 |
| v. | : : | |
| SEAN MICHAEL KRATZ, *et al.* | : : | |

| | | |
|---|---|---|
| BONNIE FINOCCHIARO and ANTHONY FINOCCHIARO, Co-Administrators of the Estate of DEAN A. FINOCCHIARO, Deceased | : : : | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| | : | December Term, 2017 |
| v. | : : | |
| | : | No. 4303 |
| SANDRA DINARDO, *et al.* | : : | |

| | | |
|---|---|---|
| MELISSA FRATANDUONO-MEO, as Personal Representative of the Estate of THOMAS C. MEO, Deceased | : : : | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| | : | January Term, 2018 |
| v. | : : | |
| | : | No. 0948 |
| SANDRA DINARDO a/k/a SANDRA AFFATATO, *et al.* | : : : | |

| | | |
|---|---|---|
| RICHARD L. PATRICK, JR., Individually and as Administrator of the Estate of JIMI T. PATRICK, Deceased, and SHARON PATRICK | : : : | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| | : | March Term, 2018 |
| v. | : : | |
| | : | No. 0044 |
| COSMO DINARDO, *et al.* | : : | |

| | | |
|---|---|---|
| MELISSA FRATANDUONO-MEO, as Administratrix *Pendente* Lite of the Estate of THOMAS C. MEO, Deceased | : : : | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| | : | July Term, 2019 |
| v. | : : | |
| | : | No. 0452 |
| SANDRA DINARDO a/k/a SANDRA AFFATATO, *et al.* | : : : | |

# <u>ORDER</u>

AND NOW, this ___ day of _____, 2021, upon consideration of Plaintiff's Joint Motion for Sanctions Against Defendant Cosmo DiNardo, Defendant Cosmo DiNardo's Counselors Thomas Kenny, Esquire and Eileen Burns, Esquire for Failure to Comply with a Court Order Pursuant to Rule 1019(a)(1)(vi) and Obstruction of a Court Ordered Deposition and the response of Defendant Cosmo DiNardo, Thomas Kenny, Esquire and Eileen Burns, Esquire thereto, it is hereby **ORDERED** and **DECREED** that the Motion is **DENIED**.

BY THE COURT:

_____
**J.**

**KENNY, BURNS & MCGILL**
By: Thomas D. Kenny, Esquire
Identification No. 77611
Two Penn Center Plaza, Suite 520
1500 John F. Kennedy Boulevard
Philadelphia, PA 19102                    Attorneys for Defendant
(215) 423-5500 (Phone)                    Cosmo DiNardo
(215) 231-9847 (Facsimile)
filings@kennyburnsmcgill.com

| | | |
|---|---|---|
| MARK R. POTASH, Individually and as Co-Administrator of the Estate of MARK R. STURGIS, deceased, and AIMEE L. KING, Individually and as Co-Administrator of the Estate of MARK R. STURGIS, Deceased | : : : : : : | COURT OF COMMON PLEAS PHILADELPHIA COUNTY  December Term, 2017  No. 2942 |
| v. | : : | |
| SEAN MICHAEL KRATZ, *et al.* | : : | |
| BONNIE FINOCCHIARO and ANTHONY FINOCCHIARO, Co-Administrators of the Estate of DEAN A. FINOCCHIARO, Deceased | : : : : | COURT OF COMMON PLEAS PHILADELPHIA COUNTY  December Term, 2017 |
| v. | : : | No. 4303 |
| SANDRA DINARDO, *et al.* | : : | |
| MELISSA FRATANDUONO-MEO, as Personal Representative of the Estate of THOMAS C. MEO, Deceased | : : : : | COURT OF COMMON PLEAS PHILADELPHIA COUNTY  January Term, 2018 |
| v. | : : | No. 0948 |
| SANDRA DINARDO a/k/a SANDRA AFFATATO, *et al.* | : : | |
| RICHARD L. PATRICK, JR., Individually and as Administrator of the Estate of JIMI T. PATRICK, Deceased, and SHARON PATRICK | : : : : | COURT OF COMMON PLEAS PHILADELPHIA COUNTY  March Term, 2018 |
| v. | : : | No. 0044 |
| COSMO DINARDO, *et al.* | : : | |

| | | |
|---|---|---|
| MELISSA FRATANDUONO-MEO, as | : | COURT OF COMMON PLEAS |
| Administratrix *Pendente* Lite of the Estate of | : | PHILADELPHIA COUNTY |
| THOMAS C. MEO, Deceased | : | |
| | : | July Term, 2019 |
| v. | : | |
| | : | No. 0452 |
| SANDRA DINARDO a/k/a SANDRA | : | |
| AFFATATO, *et al.* | : | |
| | : | |

### RESPONSE OF DEFENDANT COSMO DINARDO, THOMAS D. KENNY, ESQUIRE AND EILEEN T. BURNS, ESQUIRE IN <u>OPPOSITION TO THE PLAINTIFFS' JOINT MOTION FOR SANCTIONS</u>

Defendant Cosmo DiNardo, Thomas D. Kenny, Esquire and Eileen T. Burns, Esquire, by and through their attorneys, Kenny, Burns & McGill, respectfully submit this response in Opposition to Plaintiff's Joint Motion for Sanctions Against Defendant Cosmo DiNardo, Defendant Cosmo DiNardo's Counselors Thomas Kenny, Esquire and Eileen Burns, Esquire for Failure to Comply with a Court Order Pursuant to Rule 1019(a)(1)(vi) and Obstruction of a Court Ordered Deposition as follows:

1.      Denied.  To the extent a response is deemed required, Defendant invokes the privilege against self-incrimination as afforded to him under the Fifth Amendment of the United States Constitution and Article 9 § 1 of the Pennsylvania Constitution.

2.      Denied.  To the extent a response is deemed required, Defendant invokes the privilege against self-incrimination as afforded to him under the Fifth Amendment of the United States Constitution and Article 9 § 1 of the Pennsylvania Constitution.

3.      Denied. To the extent a response is deemed required, Defendant invokes the privilege against self-incrimination as afforded to him under the Fifth Amendment of the United States Constitution and Article 9 § 1 of the Pennsylvania Constitution.

4.      Admitted.

2

5.      The Complaint is a writing, the legal interpretation of which is a conclusion of law to which no response is required.

6.      Admitted.

7.      Admitted.

8.      Denied as stated.  It is admitted only that Mr. Kenny confirmed his availability for the deposition of Mr. DiNardo.

9.      Admitted.  By way of further answer, Mr. Kenny asked for a psyche hearing at oral argument on the motion to compel, but was denied the request.

10.     Admitted.  By way of further answer, Plaintiffs were informed that Mr. DiNardo was suffering from a severe mental defect, yet chose to proceed with the deposition instead of awaiting until his mental health stabilized.  Defense counsel was unaware that he was in the midst of a mental emergency until the time of his deposition.

11.     Admitted in part; denied in part.  It is admitted that the deposition of Mr. DiNardo was conducted on July 22, 2021.  It is expressly denied that the defense attorneys engaged in attorney misconduct or acted outrageously or egregiously.  It is further expressly denied that any of the defense attorneys impermissibly objected, force fed the information to Mr. DiNardo or coached him.  As the transcript indicates, counsel for Plaintiffs lacked civility and compassion for Mr. DiNardo and the severity of his mental illness.  Noticeably absent from Plaintiffs' motion is the fact that Mr. DiNardo stated several times that he was being housed in the POC and, while there, he was forcibly medicated with new medications.  They further fail to point out their complete lack of compassion for Mr. DiNardo's state of health.

As soon as the deposition commenced, Plaintiffs' counsel asked Mr. DiNardo five different times whether he understood that he needed to tell the truth and badgered him until he finally gave

3

the answer that Plaintiffs wanted to hear.  He immediately told them: "the problem is I'm on

medications that are impairing different things."  Dep of Mr. DiNardo, at 13:23-25.  He went on

to say:

> The medication – - they have me on trazodone, they have me on
> Abilify.  I wasn't on those medications previously, I was on 30
> milligrams of lithium.  All of the sudden they start crushing, they
> stop crushing.  The Nurse, April, brings me the medications.  I was
> in POC; I was in DTU before

He further stated that:

> "I'm trying to make it as clear as possible for you that I haven't had
> adequate sleep.  I'm in a POC cell, no mattress.  It's on camera.
> There's - - it's - - it's a big issue.  There's a lot – a lot of moving
> parts.  I'm hungry.  I'm tired."

*Id.* 15:11-18:48-22:49-3.

The POC stands for Psychiatric Observation Cells which are "for prisoners who are mentally

decompensating to the point of being considered a danger to themselves, other prisoners, and/or

property."

Mr. DiNardo also testified that his medication was being involuntarily administered to him.

"[T]hey started crushing, they stop crushing."  *Id.* 15:14-15.  Involuntarily administration of

psychotropic medication is governed by The Department of Corrections Guideline 13.8.1, 3-14

(E) which provides:

> Involuntary administration of psychotropic medication shall be
> given to an inmate only if:
>
> a.      The inmate suffers from a mental disorder and/or an
>         organic, mental, or emotional impairment that has a
>         substantial adverse impairment on the inmate's
>         cognitive/volitional function.

4

     b.       The inmate is an imminent threat of danger to self or others.

     c.       The inmate is either currently:

       (1) under an involuntary commitment in an MHU or the FTC;

       (2) under a voluntary commitment in an MHU or the FTC, but an involuntary commitment will now be initiated; and/or

       (3) is housed in a POC or infirmary, and shall be assessed for an involuntary commitment by a psychiatrist and if needed, it will now be initiated.

Thus, according to a psychiatrist at the Department of Corrections, Mr. DiNardo was suffering from a mental disorder or impairment "that has a substantial adverse impairment on [his] cognitive/volitional function" at the time he was deposed. His impaired function became evident as the deposition commenced, but the Plaintiff's counsel continued to question him, using leading questions which were not based on the facts as they exist in this case.

Shortly after the deposition, Mr. DiNardo was transferred to SCI Waymart.

12.     Admitted in part denied in part. The deposition commenced with Mr. DiNardo stating:

     Q.     Oaky. And you understand that you have to tell the truth here today?

     A.     Yeah, but the problem is I'm on medications that are impairing different things. They just put me on Abilify. I did swear to tell the truth, and that's what I'm telling you.

     Q.     Okay. So you do understand that you do need to tell the truth; correct?

    A. But if I'm incapable of – of – right now it would be biologically impossible for me to tell you – without having my glasses, being able to see what I'm looking at clearly.

*Id.* 13:21-14:8.

  As to the remaining allegations, the deposition is a writing which speaks for itself.

  13. Admitted in part denied in part.  It is admitted that after Mr. DiNardo ended his deposition and was in the process of leaving the room, Colin Burke, Esquire asked a series of questions, most of which were irrelevant to this matter.  It is expressly denied that these questions support the inference that Mr. DiNardo was competent to testify especially because at the time of his deposition he had been involuntarily medicated and housed in the POC.

  14. Denied.  It is expressly denied that Mr. DiNardo was competent to testify, and at least one psychiatrist who works for the Department of Corrections found that he was ill enough to be housed in the POC.

  15. Denied.  It is expressly denied that Mr. Kenny coached Mr. DiNardo.  As to the selected portions, no response is required, because the transcript is a writing which speaks for itself.

  16. Admitted in part; denied in part.  It is admitted that Ms. O'Donnell questioned Mr. DiNardo.  It is expressly denied that she questioned Mr. DiNardo about the murders of the four teenage boys.  To the contrary, she focused exclusively on Jimi Patrick, asking improper, leading, compound questions, some of which lacked a factual basis in order to confuse Mr. DiNardo.  The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

  17. Denied as stated.  It is admitted Mr. Kenny objected to several questions regarding Mr. DiNardo's right to assert a privilege, but there were also other legitimate bases for his

objections, including lack of competency, improper form of question, asked and answered, as well as the compound leading questions that misconstrued the facts of the case and were designed for the sole purpose of further damaging Mr. DiNardo's health.  As to the remaining allegations, the transcript is a writing which speaks for itself.

18.    Denied.  It is expressly denied that Mr. Ogren engaged in an improper speaking objection.  Rather, he was simply placing his objection on the record because Plaintiffs' counsel insisted on proceeding when it was clear Mr. DiNardo was incompetent.  As to the remaining allegations, the transcript is a writing which speaks for itself.

19.    Denied.  It is expressly denied that Ms. O'Donnell attempted to discuss the matter. To the contrary, she stated, "I'm going to move forward."  Id. At 19:14.  As to the remaining allegations, the transcript is a writing which speaks for itself.

20.    Denied. Defendant expressly denies the characterization of the testimony. Plaintiffs argue that Defendants should have filed for a protective order pursuant to Rule 601 of the Pennsylvania Rules of Evidence, but the contrary is true.  Plaintiffs went forth with a deposition when they knew there were potential competency issues.  They made no effort to reach out to defense counsel to further learn the status of his mental health.  They chose to continue with the deposition, and Mr. DiNardo appeared.  Plaintiffs can hardly complain surprise when during his deposition, Mr. DiNardo's incompetency became clear.  When he discussed his admission to the POC, and the involuntary administration of his medication., Plaintiffs completely ignored him and proceeded to ask compound, leading questions that are unsupported by any facts.  Surely, if any motion for a protective order was filed, Plaintiffs would have complained that Defendant was seeking to further delay this deposition, they had the right to see him for themselves, and filed a motion for sanctions.  Counsel was stuck in a proverbial Catch 22 situation.

21.     Denied.  It is expressly denied that Mr. Kenny acted inappropriately at any time. To the contrary, he protected his clearly incompetent client by instructing him to invoke his Fifth Amendment privilege.  As to the remaining allegations, the transcript is a writing which speaks for itself.

23.     Denied.  It is expressly denied that Mr. Kenny at any time coached his client or acted inappropriately.  As to the remaining allegations, the transcript is a writing which speaks for itself.

24.     Denied.  It is expressly denied that Mr. Kenny or Mr. Ogren at any time coached Mr. DiNardo, acted inappropriately, undermined the deposition, or instructed the deponent to not co-operate with the court ordered deposition, as indicated by the quoted testimony of Mr. DiNardo which discusses, camera recordings, Iman Erdogean, Father McCloskey and the Bucks County Coroner's office.  As to the remaining allegations, the transcript is a writing which speaks for itself.

25.     Denied.  This allegation misconstrues the testimony of Mr. DiNardo.  It was Mr. DiNardo that stated at the beginning of the deposition – before any objections were made – that he was taking new medication.  [T]he problem is I'm on medications that are impairing different things."  *Id* at 13:23-25.  He was merely repeating what he had said earlier, trying to explain to Ms. O'Donnell that he was taking new medication and it was affecting him.  Ms. O'Donnell repeatedly ignored him.  Indeed, she never asked him what he meant by POC.

26.     Denied. It is expressly denied that Mr. Kenny or Mr. Ogren acted inappropriately and the characterization of the testimony by Plaintiffs misconstrues the testimony of Mr. DiNardo. It was Mr. DiNardo that stated at the beginning of the deposition – before any objections were made – that he was taking new medication.  [T]he problem is I'm on medications that are impairing different things."  *Id* at 13:23-25.  He was merely repeating what he had said earlier, trying to

8

explain to Ms. O'Donnell that he was taking new medication and it was affecting him.  Ms. O'Donnell continued to ignore him, and despite him stating that he was being housed in the POC, asked him questions clearly designed to take advantage of his incompetency and ask compound, leading, improper questions that misconstrued the facts, presumably in order to gain a tactical advantage or to get a sound bite for trial or for the press.  Defendants were required to launch objections. Indeed, if Defendants did not object, then Plaintiffs would have argued the objections were waived.

27.    Denied.  It is expressly denied that Ms. Weinrich made an impermissible speaking objection.  To the contrary, she was required to object to the improper questions as well as the competency of Mr. DiNardo.  Indeed, if Defendants did not object, then Plaintiffs would have argued the objections were waived.

28.    Denied.  It is expressly denied that Ms. Burns coached the witness or obstructed a court ordered deposition.  To the extent Plaintiffs contend Mr. DiNardo was competent, then they must accept his sworn testimony that he was not coached.  *Id.* 32:22-23.

29.    Denied.  It is expressly denied that Mr. Ogren acted inappropriately.  Plaintiffs continued to ask objectionable inflammatory questions, and Mr. Ogren was required to object to them.  Indeed, if Defendants did not object, then Plaintiffs would have argued the objections were waived.

30.    Denied. It is expressly denied that any of the Defense attorneys coached Mr. DiNardo.  To the extent Plaintiffs contend Mr. DiNardo was competent, then they must accept his sworn testimony that he was not coached.  *Id.* 32:22-23.

31.     Denied.  Plaintiffs' counsel claim that Mr. Kenny's statement resulted in the deposition ended.  However, after Plaintiffs launched their speaking objections, Mr. Kenny stated "So keep going guys." *Id*. at 36:6.

32.     Admitted in part; denied in part.  It is admitted that Mr. DiNardo made those statements.  It is expressly denied that it was made immediately after Mr. Kenny spoke.  Rather, it appears from the transcript that Mr. DiNardo was reacting to Ms. O'Donnell's claim that "defense counsel has completely attempted to coach this witness.  Mr. DiNardo stated:

> No Ms. O'Donnell, I'm going to stop you right there.  You prohibited me when I was in the POC.  There are issues going on, medication change.  Done.

*Id.* at 33:7-16.

Again Ms. O'Donnell ignored what he was saying, so he continued to try to explain, as evidenced by the quoted testimony set forth in this paragraph.

33.     Denied.  As set forth above, Ms. Burns did not act inappropriately, and was required to object on behalf of her client.  It was Mr. DiNardo that stated at the beginning of the deposition – before any objections were made – that he was taking new medication.  [T]he problem is I'm on medications that are impairing different things." *Id* at 13:23-25.  He was merely repeating what he had said earlier, trying to explain to Ms. O'Donnell that he was taking new medication and it was affecting him.  Ms. O'Donnell continued to ignore him, and despite him stating that he was being housed in the POC, asked him questions clearly designed to take advantage of his incompetency and ask compound, leading, improper questions that misconstrued the facts, presumably in order to gain a tactical advantage or to get a sound bite for trial or for the press.  Defendants were required to launch objections. Indeed, if Defendants did not object, then Plaintiffs would have argued the objections were waived.

34.    Denied.  It was Mr. DiNardo that stated at the beginning of the deposition – before any objections were made – that he was taking new medication.  [T]he problem is I'm on medications that are impairing different things."  *Id* at 13:23-25.  He was merely repeating what he had said earlier, trying to explain to Ms. O'Donnell that he was taking new medication and it was affecting him.  Ms. O'Donnell continued to ignore him, and despite him stating that he was being housed in the POC, asked him questions clearly designed to take advantage of his incompetency and ask compound, leading, improper questions that misconstrued the facts, presumably in order to gain a tactical advantage or to get a sound bite for trial or for the press. Defendants were required to launch objections. Indeed, if Defendants did not object, then Plaintiffs would have argued the objections were waived.

35.    Admitted in part; denied in part.  It is admitted only that a breakout room was requested.  The remaining allegations are denied.   Before the breakout room was requested, Mr. DiNardo continued to explain his medical condition to Ms. O'Donnell, which she continued to ignore.

> A.    . . . I'm trying to make it as clear as possible for you that I haven't had adequate sleep.  I'm in a POC cell, no mattress. It's on camera.  There's – it's a big issue.  There's a lot - - a lot of moving parts.  I'm hungry.  I'm tired.

*Id.* 48:22-49:3.

Ms. O'Donnell immediately interrupted Mr. DiNardo with a question, completely unrelated to his response:  "After July 2016, before the murder "  *Id.* at 48-22-49:3.

36.    Admitted in part; denied in part.  It is admitted that Mr. DiNardo requested to return to his cell.  It is denied that he parroted his attorneys.  The remaining allegations are denied.

37.    Denied. It is expressly denied that Ms. Burns violated any court order.

38.     Denied. It is expressly denied that Ms. Burns violated a court order.  It is admitted that she stated, "He said he doesn't want to proceed," but that was in response to Ms. O'Donnell's further attempt to harass him.

39.     Denied. It is admitted further questions were asked of Mr. DiNardo.  It is denied that those questions established he was competent.

40.     Admitted in part; denied in part.  It is admitted that Mr. DiNardo ended the deposition, because he wanted to return to his cell, and in response, Ms. Burns asked Mr. DiNardo if he was ending the deposition.  Mr. DiNardo ended the deposition, because "I'm not in a state to answer any more questions.  Can I go back to my cell?  *Id.* at 60:9-11.

41.     Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

42.     Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

43.     Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

44.     Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

45.    Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

46.    Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

47.    Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

48.    Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

49.    Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

50.    Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

51.    Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

52.     Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

53.     Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

54.     Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

55.     Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

56.     Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

57.     Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

58.     Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

59.     Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

60.     Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

61.     Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

62.     Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

63.     Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

64.     Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

65.     Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

66.      Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

67.      Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

68.      Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

69.      Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

70.      Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

71.      Denied.  The transcript is a writing which speaks for itself.

72.      Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

73.      Denied.  The transcript is a writing which speaks for itself.

74.      Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

16

75.    Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

76.    Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

77.    Denied. The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent a response is deemed required, the allegations are denied.

**WHEREFORE**, Defendant respectfully requests this Honorable Court enter an appropriate Order denying Plaintiff's Joint Motion for Sanctions Against Defendant Cosmo DiNardo, Defendant Cosmo DiNardo's Counselors Thomas Kenny, Esquire and Eileen Burns, Esquire.\

Respectfully submitted,

**KENNY, BURNS & MCGILL**

By:    /s/*Thomas D. Kenny*
Thomas D. Kenny, Esquire
Attorneys for Defendant
Cosmo DiNardo

Dated: August 19, 2021

**KENNY, BURNS & MCGILL**
By: Thomas D. Kenny, Esquire
Identification No. 77611
Two Penn Center Plaza, Suite 520
1500 John F. Kennedy Boulevard
Philadelphia, PA 19102                          Attorneys for Defendant
(215) 423-5500 (Phone)                          Cosmo DiNardo
(215) 231-9847 (Facsimile)
filings@kennyburnsmcgill.com

| | | |
|---|---|---|
| MARK R. POTASH, Individually and as Co-Administrator of the Estate of MARK R. STURGIS, deceased, and AIMEE L. KING, Individually and as Co-Administrator of the Estate of MARK R. STURGIS, Deceased | : : : : : : | COURT OF COMMON PLEAS PHILADELPHIA COUNTY December Term, 2017 No. 2942 |
| v. | : : | |
| SEAN MICHAEL KRATZ, *et al.* | : : | |
| BONNIE FINOCCHIARO and ANTHONY FINOCCHIARO, Co-Administrators of the Estate of DEAN A. FINOCCHIARO, Deceased | : : : : | COURT OF COMMON PLEAS PHILADELPHIA COUNTY December Term, 2017 |
| v. | : : | No. 4303 |
| SANDRA DINARDO, *et al.* | : : | |
| MELISSA FRATANDUONO-MEO, as Personal Representative of the Estate of THOMAS C. MEO, Deceased | : : : : | COURT OF COMMON PLEAS PHILADELPHIA COUNTY January Term, 2018 |
| v. | : : | No. 0948 |
| SANDRA DINARDO a/k/a SANDRA AFFATATO, *et al.* | : : | |
| RICHARD L. PATRICK, JR., Individually and as Administrator of the Estate of JIMI T. PATRICK, Deceased, and SHARON PATRICK | : : : : | COURT OF COMMON PLEAS PHILADELPHIA COUNTY March Term, 2018 |
| v. | : : | No. 0044 |
| COSMO DINARDO, *et al.* | : : | |

| | | |
|---|---|---|
| MELISSA FRATANDUONO-MEO, as | : | COURT OF COMMON PLEAS |
| Administratrix *Pendente* Lite of the Estate of | : | PHILADELPHIA COUNTY |
| THOMAS C. MEO, Deceased | : | |
| | : | July Term, 2019 |
| v. | : | |
| | : | No. 0452 |
| SANDRA DINARDO a/k/a SANDRA | : | |
| AFFATATO, *et al.* | : | |
| | : | |

### MEMORANDUM OF LAW
### IN OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS

Defendant Cosmo DiNardo, Thomas D. Kenny, Esquire, and Eileen T. Burns, Esquire, by and through his attorneys, Kenny, Burns & McGill, hereby submits this Memorandum of Law in in Opposition to Plaintiffs' Motion for Sanctions.

**I.     MATTER BEFORE THE COURT**

The matter before this Honorable Court is Plaintiffs' Joint Motion for Sanctions Against Defendant Cosmo DiNardo, Defendant Cosmo DiNardo's Counselors Thomas Kenny, Esquire and Eileen Burns, Esquire and the Response of Cosmo DiNardo, Thomas Kenny, Esquire and Eileen Burns, Esquire

**II.     QUESTIONS PRESENTED**

A.     Should the Motion for Sanctions be denied wherein Thomas D. Kenny, Esquire and Eileen T. Burns, Esquire validly objected to Mr. DiNardo's competency once it became clear that he was housed in the Psychiatric Observation Cell, involuntarily medicated and suffering from a mental health emergency and counsel for Plaintiffs repeatedly asked improper, invalid, compound, leading questions in an attempt to take advantage of his mental health emergency?

Suggested Answer: Yes

B.     Should the Motion for Sanctions be denied wherein Mr. DiNardo has a valid Fifth Amendment privilege against self-incrimination and his refusal to answer questions, as an

2

assertion of a constitutional privilege against self-incrimination cannot be construed as a basis for sanctions?

Suggested Answer:  Yes.

## III.   <u>FACTUAL BACKGROUND</u>

After Mr. DiNardo entered a guilty plea to First Degree murder for the killings of Mark R. Sturgis, Dean A. Finocchiaro, Jimi T. Patrick and Thomas C. Meo, Plaintiffs commenced this wrongful death action.  In response to a motion of Plaintiffs, Mr. DiNardo was ordered to be deposed.  The Deposition occurred on July 22, 2021.  Mr. DiNardo ended the deposition, and now Plaintiffs seek to sanction Mr. DiNardo and his counsel.

Plaintiffs' attorneys have selectively placed before this Court portions of the transcript in an attempt to make the inference that Defense counsel acted inappropriately during the deposition. Plaintiffs make it seem as if Defendant and Defense counsel disregarded this Court's Order compelling his deposition as well as disregarded the Rules of Civil Procedure.  However, the contrary is true.  Defense counsel not only acted appropriately under the circumstances by objecting to his competency to testify, but also attempted to protect him by invoking his Fifth Amendment right against self-incrimination when he was clearly suffering from a mental health emergency.

During the deposition and in their briefing Plaintiffs select portions of the transcript in an attempt to create the inference that he was competent to testify, but completely ignore Mr. DiNardo's statements that he was being housed in the POC, he was taking new anti-psychotic medications and they were being involuntarily administered to him.  Before Ms. O'Donnell began asking any substantive questions, Mr. DiNardo testified:

> No.  The medication -- they have me on trazodone, they have me on
> Abilify,  I  wasn't on those medications previously.  I was on 300

3

> milligrams of lithium.  All of a sudden they start crushing, they stop
> crushing.  The nurse, April, brings me the medication, I was in POC;
> I was in DTU before.  Does that help  you any?

*Id.* 15:11-18.

Instead of inquiring further about the POC, the DTU or the crushing of his medication in order to involuntarily medicate him, Plaintiffs proceeded with the deposition.  Plaintiffs did not provide Mr. DiNardo with any instructions regarding how the deposition should proceed.  Plaintiffs did not ask him the proverbial question regarding are you taking any medication or suffering from any illness which would affect your ability to understand the questions and answer truthfully.  She did not even ask him to state his name for the record.  Rather, she started off with the following question, presumably in an attempt to take advantage of and further damage Mr. DiNardo's poor mental condition:

"So you know that you had killed Jimi Patrick with a .22 SIG Sauer; correct?"

*Id.* 16:7-8.

Of course, that question lead to a series of objections.  Presumably aware of his inability to understand, she then continued to try to take advantage of him, by asking compound questions that lacked any factual basis in the record:

> And the ammunition that you used to kill Jimi Patrick and that you
> used in the .22 SIG Sauer, you also stored that ammunition at the
> farm in New Hope" is that correct?"

*Id.* 26: 19-22.

She also asked questions designed to inflame the listener:

> When you shot Jimi Patrick, did he (distorted audio) bleed or did
> you see any blood at all?

*Id.* 45:22-23.

The majority of the deposition was Mr. DiNardo pleading the Fifth Amendment privilege against incrimination, the attorneys placing objections on the record to the improper questions and Mr. DiNardo stating that he could not see without his glasses, he was hungry, he was tired, he had a headache, he was housed in the POC and he was taking new medications which negatively affected him.

It was clear from the beginning that Mr. DiNardo was in such poor mental health and medicated to such an extent that he was incapable of not only understanding the questions but also the legal ramifications of any response he provided.  A psychiatrist for the Department of Correction agrees, because at the time of his deposition, he was being housed in the POC, which stands for a Psychiatric Observation Cell.  The Department of Corrections defines a POC as a cell located in the infirmary area of the facility that is used to hold inmates who are "mentally decompensating to the point where they are considered an imminent danger to themselves, other inmates, and/or property."[1]  POC admissions are ordered where "a psychiatric emergency exists."[2]  Mr. DiNardo also testified that his medication was being involuntarily administered to him.  "[T]hey started crushing, they stop crushing."   Involuntarily administration of psychotropic medication is governed by The Department of Corrections Guideline 13.8.1, 3-14 (E) which provides:

> Involuntary administration of psychotropic medication shall be given to an inmate only if:
>
> a.      The inmate suffers from a mental disorder and/or an organic, mental, or emotional impairment that has a substantial adverse impairment on the inmate's cognitive/volitional function.

---

[1] https://www.justice.gov/sites/default/files/crt/legacy/2014/02/25/pdoc_finding_2-24-14.pdf at p. 5.

[2] https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/13.08.01%20Access%20to%20Mental%20Health%20Care.pdf

      b.      The inmate is an imminent threat of danger to self or others.

      c.      The inmate is either currently:

      (1) under an involuntary commitment in an MHU or the FTC;

      (2) under a voluntary commitment in an MHU or the FTC, but an involuntary commitment will now be initiated; and/or

      (3) is housed in a POC or infirmary, and shall be assessed for an involuntary commitment by a psychiatrist and if needed, it will now be initiated.

Thus, according to a psychiatrist at the Department of Corrections, Mr. DiNardo was suffering from a mental disorder or impairment "that has a substantial adverse impairment on [his] cognitive/volitional function" at the time he was deposed. His impaired function became evident as the deposition commenced but the Plaintiff's counsel continued to question him, using leading questions which were not based on the facts as they exist in this case, designed to harass Mr. DiNardo and further damage his health. The strategy worked, because shortly after the deposition, Mr. DiNardo was transferred to SCI Waymart where he remains today.

Plaintiffs have selectively taken statements from Mr. DiNardo's deposition and characterized it unfairly. Defendants have pointed out some of the statements made by Mr. DiNardo, but request that the court examine the transcript as a whole to see why all of the defense counsel stated on the record that Mr. DiNardo was incompetent and that it was inhumane to continue to depose him while Plaintiffs' counsel thought that continuing the deposition was proper. The Court will have to make this determination should Plaintiffs' counsel attempt to use his deposition at trial.

6

## IV.   **ARGUMENT**

    **A.**    **Mr. DiNardo was incompetent to testify.  Thomas D. Kenny, Esquire and Eileen T. Burns, Esquire launched valid objections to Mr. DiNardo's competency once it became clear that he was housed in the Psychiatric Observation Cell, involuntarily medicated and suffering from a mental health emergency. They further properly objected to the form of the question as well as properly instructed him to invoke his privilege against self-incrimination; therefore the Motion for Sanctions should be denied.**

"[T]he purpose of discovery sanctions is to secure compliance with our discovery rules and court orders in order to move the case forward and protect the substantive rights of the parties, while holding those who violate such rules and orders accountable." *Rohm & Haas Co. v. Lin*, 2010 PA Super 26, 992 A.2d 132, 147 (Pa. Super. 2010), cert. denied, 565 U.S. 1093, 132 S. Ct. 852, 181 L. Ed. 2d 550 (2011).  Defiance of discovery orders "is a direct affront to the authority of the trial court and to the integrity of the judicial system and rule of law." *Id.* at 143.

Generally, imposition of sanctions for a party's failure to comply with discovery is subject to the discretion of the trial court as is the severity of the sanctions imposed.  Nevertheless, the court's discretion is not unfettered:  because dismissal is the most severe sanction, it should be imposed only in extreme circumstances, and a trial court is required to balance the equities carefully and dismiss only where the violation of the discovery rules is willful and the opposing party has been prejudiced.  *Id.* at 142 (internal citations, quotation marks, and emphasis omitted).

"[T]he exercise of judicial discretion in formulating an appropriate sanction [o]rder requires the court to select a punishment which 'fits the crime.'"  *Weist v. Atlantic Richfield Co.*, 543 A.2d 142, 144 (Pa. Super. 1988).  "[W]here a discovery sanction either terminates the action directly or would result in its termination by operation of law, the [trial] court must consider multiple factors balanced against the necessity of the sanction." *Anthony Biddle Contrs., Inc. v. Preet Allied Am.*

*St., LP*, 28 A.3d 916, 926 (Pa.Super. 2011).  The following factors are applied to determine whether dismissal is appropriate as a discovery sanction:

> (1)  the nature and severity of the discovery violation;
>
> (2)  the defaulting party's willfulness or bad faith;
>
> (3)  prejudice to the opposing party;
>
> (4)  the ability to cure the prejudice; and
>
> (5)  the importance of the precluded evidence in light of the failure to comply.

*Scampone v. Grane Healthcare Company*, 169 A.3d 600, 628 (Pa. Super. 2017), *appeal denied*, 647 Pa. 64, 188 A.3d 388 (2018).  *See also Cove Centre, Inc.*, supra at 262.  The Superior Court has consistently placed greater emphasis on (i) the prejudice to the non-offending party and the ability to cure that prejudice, and (ii) the willfulness of the offending party's conduct. *City of Philadelphia v. Fraternal Order of Police Lodge No. 5 (Breary)*, 604 Pa. 267, 286, 985 A.2d 1259, 1271 (2009). Importantly, "each factor represents a necessary consideration, not a necessary prerequisite." *Rohm & Haas Co*., *supra* at 142.

> **1.    Thomas D. Kenny, Esquire and Eileen T. Burns, Esquire did not improperly coach Mr. DiNardo, and levied proper objections to his competency, to the improper questions as well as his right to assert his privilege against self-incriminations.**

Every objection made at the deposition complied with the Pennsylvania Rules of Civil Procedure.  Rule 4016 of the Pennsylvania Rules of Civil Procedure governs objections in the taking of depositions.  It provides:

> Taking of Depositions. Objections
>
> (a)    Objection to taking a deposition because of the disqualification of the person before whom it is to be taken is waived unless made before the taking of the deposition begins or as soon thereafter as the disqualification becomes known or could be discovered with reasonable diligence.

(b)      Objections to the competency of a witness or to the competency, relevancy, or materiality of the testimony are not waived by failure to make them before or during the taking of the deposition, unless the ground of the objection is one which was known to the objecting party and which might have been obviated or removed if made at that time.

(c)      Errors and irregularities occurring at the oral examination in the manner of taking the deposition, in the form of oral questions or answers, in the oath or affirmation, or in the conduct of parties and errors of any kind which might have been obviated, removed, or cured if objections had been promptly made, are waived unless seasonable objection is made at the taking of the deposition.

(d)      All errors and irregularities in the notice for taking a deposition are waived unless written objection is promptly served upon the party giving the notice.

At the time of his deposition, it immediately became clear that Mr. DiNardo was incompetent to testify.  In response to a simple question as to whether he was invoking his Fifth Amendment privilege he stated:

I'm in state prison, SCI Huntingdon.  Now they got me on new medication; okay?  The camera recordings speak for themselves. Today is July 22, 2021.  What – in what sense –

Listen, I speak with the Iman Erdogan, I spoke to Father McCloskey when I was at Holy Ghost in the State of Pennsylvania.  I don't -- I don't have the – I don't have any – any answers that – that would – it's been previously determined by the coroner's office in Bucks County what occurred, and that's that.  That's the criminal matter.

*Id.* 24-11-25:3.

Throughout the course of the deposition, Ms. O'Donnell continued with her compound, leading questions, most of which lacked a factual basis, presumably in an attempt to provide sound bites to the jury.  Mr. DiNardo was in no shape to answer any questions.  He repeatedly stated he was hungry, he could not see, he could not hear her, he was taking new medication, he had a headache, he did not want to answer questions.  Defense counsel had every right to object to his

competency, to object to the form of questions and to assist him in invoking his Fifth Amendment privilege.

### 2.    Mr. Dinardo, Mr. Kenny and Ms. Burns did not act in Bad Faith.

Plaintiffs use a bevy of Federal and county cases in an attempt to support their contention, that the objections placed on the record by Defense Counsel and their assertion of privilege constituted coaching of Mr. DiNardo.  Not only is their argument contrary to the facts, but it also lacks a legal basis.

Plaintiffs begin by citing *Hall v. Clifton* 150 FRD 525, 530 (E.D. Pa. 1993), contending that Defendants are not allowed to make speaking objections.  However, the Superior Court has stated that "Hall is not controlling precedent," because "federal cases have no precedential authority in this Court. *Id.  Yoskowitz v. Yazdanfar*, 900 A.2d 900, 906 (Pa. Super. 2006), (citing *PECO Energy Co. v. Ins. Co. N. America*, 852 A.2d 1230, 1234 n.5 (Pa. Super. 2004).

The Honorable R. Stanton Wettick, a highly-regarded judge of the Allegheny County Court of Common Pleas examined *Hall* in *Acri v. Golden Triangle Management Acceptance Co.*, 1994 Pa. Dist. & Cnty. Dec. LEXIS 150, 1994 WL 16919157 (Alleg. Co. 1994).  Judge Wettick opted not to follow the *Hall v. Clifton Precision* guidelines because:  (1) they prohibit counsel for a party being deposed from raising objections that our discovery rules specifically allow; (2) they provide insufficient protection to the deponent; (3) they can produce results that could not have been intended; (4) they fail to recognize the proper role of counsel; (5) they increase the burden and expense of litigation; and (6) they are not necessary to curb the discovery abuses which are described in the *Hall v. Clifton Precision* opinion."

1994 Pa. Dist. & Cnty. Dec. LEXIS 150, at *3.

In reaching his decision, Judge Wettick noted that Defense attorneys have an obligation to protect their clients from being mistreated during the discovery process.  He reasoned:

> However, *Hall v. Clifton Precision* did not discuss the costs of such a rule. While the *Hall v. Clifton Precision* guidelines silence the unethical attorney when I (an ethical attorney) am deposing his or her client, it also silences me when this unethical attorney goes after my client at my client's deposition.  This is a bad tradeoff because of the enormous damage that the unethical attorney can do to my client and to the relationship between my client and myself if I am silenced while my client is being unfairly deposed.
>
> Our discovery rules seek to achieve two goals: (1) to provide a fairer outcome to the litigation and (2) to reduce the burden that the litigation imposes on the litigants and other participants. The second goal requires that rude and abusive behavior toward litigants and other witnesses not be a part of the discovery process. Consequently, every attorney who is involved in the process must have the ability to prevent the mistreatment of any *witness.*

Judge Wettick was concerned that counsel defending the deposition would be turned into the proverbial fly on the wall – forced to sit there and do nothing to protect their client – if *Hall* was followed:

> If counsel for the deponent is relegated to the position of a fly on the wall because unethical attorneys abuse the discovery process, the "question and answer session" between a lawyer and a witness that *Hall v. Clifton Precision* seeks to achieve in order to uncover the facts in a lawsuit can become an exercise in which these unethical attorneys will substitute their words for the words of the deponent and create sound bites for the jury.

Defense Counsel had a duty to protect their client from the mistreatment he received during his deposition.  His repeated complaints of being hungry, tired, forcibly medicated and unable to hear or see were repeatedly ignored by Ms. O'Donnell.  Ms. O'Donnell showed no compassion for Mr. DiNardo.  Instead, Ms. O'Donnell focused on asking Mr. DiNardo leading, compound questions in the hopes of further damaging Mr. DiNardo's fragile mental state and getting her sound bites for the jury:  Ms. O'Donnell asked

11

> And Mr. DiNardo, after July 2016 you would agree that your parents were aware that you engaged in the use of firearms, specifically the .22 SIG Sauer, is that correct?"
>
> When you shot Jimi Patrick, did he (distorted audio) or did you see any blood at all?
>
> He was in no condition to answer questions.  He has fundamental constitutional rights, and his mental health prevented him from knowingly waiving or asserting them.

Plaintiffs are trying to mislead this court into stating that defense counsel "coached" Mr. DiNardo into ending the deposition, because after a break he stated he did not want to continue. This argument ignores Mr. DiNardo's prior attempt to end the deposition, when he stood up and tried to turn off the video but was stopped by the guards.  In response, one of the two Correction Officers told him to "sit down.  If you're ending this, then you can tell them that."  Mr. DiNardo did not state he was ending the deposition, and it continued.  Further factors establishing that he was not coached is the fact that he testified under oath on more than one occasion that he was not coached.  Finally, even after Mr. DiNardo stated he did not want to answer any more questions, counsel for Plaintiffs persisted in their questions and Mr. DiNardo answered them.

### 3.    Prejudice to the Opposing Party.

Ms. O'Donnell's questions were nothing more than sound bites for the jury and further damaged Mr. DiNardo's health.  She contends in her brief that she needs to question Mr. DiNardo so she can have an adverse inference read to the jury.  Any need for an adverse inference is undermined by the fact that Mr. DiNardo is estopped from denying the facts in his guilty plea; therefore, the jury will be instructed to find him responsible for the deaths of the Plaintiffs' decedents.

Plaintiffs have the information they need to prosecute their claim against him.  Plaintiffs have the benefit of his guilty plea and his recorded statement to law enforcement, they have the

benefit of the discovery in the criminal trial of Sean Kratz, they will not be hindered in any way in their prosecution of their claim against Mr. DiNardo

**B.      Mr. DiNardo cannot be held in contempt for invoking his privileges against self-incrimination and refusing to answer questions, as an assertion of a constitutional privilege against self-incrimination cannot be contempt of court.**

The Fifth Amendment's privilege can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory. *Chavez v. Martinez*, 538 U.S. (2003); *Kastigar v. United States*, 406 U.S. 441, 444-445 (1972).  The privilege protects witnesses from being forced to give incriminating testimony, unless immunized. *Kastigar*, *supra*, at 453; *Maness v. Meyers*, 419 U.S. 449, 461-462 (1975).  *Pillsbury Co. v. Conboy*, 459 U.S. 248, 261 (1983). The assertion of the privilege often depends upon sound legal advice from someone who is trained and skilled in the subject, as a layman may not be aware of the precise scope and nuances of the Fifth Amendment. *Mayers*, 419 U.S. at 466; *U. S. v. Mandujano*, 425 U.S. 564 (1976).

The Fifth Amendment privilege encompass evidence which may lead to criminal conviction, as well as information which would furnish a link in the chain of evidence that could lead to prosecution, and evidence which an individual reasonably believes could be used against him. *Meyers*, 419 U.S. at 462.  In the Fifth Amendment context, greater protections must be afforded, since once the proverbial cat is out of the bag, there is no assurance any judicial remedy can put it back. *Meyers*, 419 U.S. at 463.  Prophylactic rules have been established to protect witnesses from being forced to give incriminating testimony unless that testimony has been immunized before it is compelled. *Chavez*, 538 U.S. at 770-771, citing *Kastigar*, 406 U.S. at 453.

In the context of a civil proceeding, "[a] witness may properly invoke the privilege when he reasonably apprehends a risk of self-incrimination though no criminal charges are pending against him." *In re Corrugated Container Antitrust Litig*., 662 F.2d 875, 882 (D.C. Cir. 1981)

(holding that a Fifth Amendment assertion was proper in a civil action because there was no "guarantee . . . that a criminal action would not be started"). "[A] witness may have a reasonable fear of prosecution and yet be innocent of any wrongdoing." *Slochower v. Board of Education*, 350 U.S. 551, 557 (1956). A claim of privilege passes constitutional muster where "a fear of prosecution . . . is more than fanciful or merely speculative*." In re Corrugated Container Antitrust Litig.*, 662 F.2d at 883.

The Fifth Amendment privileges both directly incriminating answers, as well as any answers that "would furnish a link in the chain of evidence needed to prosecute[.]" *Id.* at 882. Notably, the witness does not bear the burden of actually establishing the risk of prosecution. *See In re Corrugated Container Antitrust Litig*., 662 F.2d at 882-83 ("[I]f the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee."). The "inquiry into the scope of the privilege is limited by the Fifth Amendment and the judge may not force a witness to prove incrimination by testimony." *Anton*, 233 F.R.D. at 218. Instead, the court need "determine only whether there is a reasonable basis for believing a danger to the witness might exist." *Id.*

Once asserted, whether framed in ordinary or technical terms, the burden falls to the Government --or in this case Plaintiffs --to "make it 'perfectly clear' that the answers sought 'cannot possibly' tend to incriminate." *Yurasovich,* 580 F.2d at 1221 (*quoting Malloy v. Hogan*, 378 U.S. 1, 12, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964)). That requires resolving any "ambiguity" and showing that the witness will not run the risk of self-incrimination. *Id.* It is a predictable standard that appropriately tasks the government, or in this case, Plaintiffs with producing evidence

14

and argument that honors the guarantees of the Constitution. *United States v. Morton*, 993 F.3d 198, 205 (3d Cir. 2021).

Plaintiffs' argument that Mr. DiNardo's guilty plea precludes him from invoking his Fifth Amendment privilege against self-incrimination lacks merit. While it is true that in general, "once a person is convicted of a crime, he no longer has the privilege against self-incrimination as he can no longer be incriminated by his testimony about said crime." *Reina v. U.S*., 364 U.S. 507, 513, 5 L. Ed. 2d 249, 81 S. Ct. 260 (1960); *see U.S. v. Romero*, 249 F.2d 371, 375 (2d Cir. 1957. "If the witness is still subject to prosecution for other crimes which his testimony might tend to reveal, the privilege remains." *Yurasovich*, 580 F.2d at 1218 (stating that "pleading guilty to counts involving one set of offenses by its own force [] [does not] waive a privilege with respect to other alleged transgressions for which charges are dropped and which were not admitted"); *see also United States v. Frierson*, 945 F.2d 650, 656-657 (3d Cir. 1991).

While Plaintiffs might argue that the chance of prosecution for other crimes is slim due to his current sentence of four consecutive life terms, the chances of prosecution for those other offenses does not have any impact on his right to invoke his Fifth Amendment rights after the time to appeal his conviction expired. Mr. DiNardo's testimony could easily lead to further prosecution for a host of other crimes not encompassed by his prior conviction. Federal law enforcement agencies investigated this matter and it would not violate double jeopardy if they charged Mr. DiNardo. The potential for self-incrimination here is sufficient to justify Mr. DiNardo's assertion of his Fifth Amendment rights. Mr. DiNardo's prospective deposition will inevitably cover matters that might "furnish a link in the chain of evidence needed to prosecute." Accordingly, he properly asserted his privilege against self-incrimination.

## V.     **CONCLUSION**

For all of the foregoing reasons, Defendant Cosmo DiNardo respectfully requests that this

Honorable Court enter the attached Order denying the Plaintiffs' Joint Motion for Sanctions.

Respectfully submitted,

**KENNY, BURNS & MCGILL**

By:     */s/ Thomas D. Kenny*
Thomas D. Kenny, Esquire
Attorneys for Defendant
Cosmo DiNardo

Dated: August 19, 2021

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas D. Kenny, Esquire, hereby certify that I caused a true and correct copy of the

foregoing document to be served via this Court's electronic filing system upon all counsel of record

on the date set forth below.

*/s/Thomas D. Kenny*
Thomas D. Kenny, Esquire

Dated:  August 19, 2021